Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

STEVE NAVARRO-VARGAS,
          *Defendant-Appellant.*

No. 02-50663

D.C. No.
CR-02-01706-MLH

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

JOSE ANTONIO LEON-JASSO,
          *Defendant-Appellant.*

No. 03-50009

D.C. No.
CR-02-01479-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted En Banc
October 14, 2004—San Francisco, California

Filed May 23, 2005

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Michael Daly Hawkins, Barry G. Silverman,
Kim McLane Wardlaw, William A. Fletcher,
Marsha S. Berzon, Johnnie B. Rawlinson, Richard R. Clifton,
Jay S. Bybee, and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Hawkins

## COUNSEL

Matthew C. Winter, Steven F. Hubachek, Federal Defenders of San Diego, Inc., San Diego, California, for defendant-appellant Steve Navarro-Vargas.

Patrick K. O'Toole, David W. Mitchell, Office of United States Attorney, San Diego, California, for plaintiff-appellee the United States.

Matthew C. Winter, Steven F. Hubachek, Federal Defenders of San Diego, Inc., San Diego, California, for defendant-appellant Jose Antonio Leon-Jasso.

Patrick K. O'Toole, Office of United States Attorney, San Diego, California, for plaintiff-appellee the United States.

---

## OPINION

BYBEE, Circuit Judge:

This is the fourth challenge we have heard in this circuit[1] to consider whether the model grand jury instructions violate the Fifth Amendment by undermining the independence of the grand jury. The Appellants contend that their indictments should be dismissed because the district court misinstructed the grand jury in its constitutional role. After examining the history of the grand jury and the structure of the Grand Jury Clause of the Fifth Amendment, we determine that these instructions do not violate the Constitution. Accordingly, we

---

[1]*See United States v. Rivera-Sillas*, 376 F.3d 887, 893-94 (9th Cir. 2004) (upholding the grand jury instructions against a challenge that they improperly circumscribed the subject matter of the grand jury's inquiries and deliberations by instructing them not to consider the wisdom of criminal laws); *United States v. Adams*, 343 F.3d 1024, 1027 n.1 (9th Cir. 2003); *United States v. Marcucci*, 299 F.3d 1156, 1164-65 (9th Cir. 2002).

affirm the district courts' denial of Appellants' motions to dismiss their indictments.

## I.   FACTS AND PROCEEDINGS BELOW

Because these cases present the same issues, we consolidated them for oral argument and disposition. In No. 02-50663, Steve Navarro-Vargas ("Navarro-Vargas") entered a conditional guilty plea to importing marijuana in violation of 21 U.S.C. §§ 952 and 960 and possessing a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). In No. 03-50009, Jose Antonio Leon-Jasso ("Leon-Jasso") conditionally pled guilty to importing cocaine into the United States and possessing a controlled substance, also in violation of 21 U.S.C. §§ 952, 960 and 841. Each of the Appellants contends that his Fifth Amendment rights were violated because he was denied the unfettered judgment of the grand jurors. Navarro-Vargas and Leon-Jasso also argue that 21 U.S.C. § 960 and 841 are unconstitutional on their face because they require judges to determine sentencing factors.

In each case the district court instructed the grand jury using the model charge recommended by the Judicial Conference of the United States.[2] The grand jury charge included the following explanations and instructions (for convenience we have numbered the paragraphs):[3]

> [1] The purpose of a Grand Jury is to determine whether there is sufficient evidence to justify a formal accusation against a person. If law enforcement

---

[2] Congress has granted authority to the Judicial Conference of the United States to "adopt rules and regulations governing the provisions and the operation of the plans formulated" by current law dealing with grand jury procedure. 28 U.S.C. § 1863(a).

[3] This quoted section is the charge given to the grand jury by District Judge Jeffrey Miller. There are minor differences between the model charge and the charge given in these cases, which are irrelevant for our purposes.

officials were not required to submit to an impartial Grand Jury proof of guilt as to a proposed charge against a person suspected of having committed a crime, they would be free to arrest and bring to trial a suspect no matter how little evidence existed to support the charge.

[2] As members of the Grand Jury, you in a very real sense stand between the government and the accused. It is your duty to see to it that indictments are returned only against those whom you find probable cause to believe are guilty and to see to it that the innocent are not compelled to go to trial.

. . . .

[3] You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you. Furthermore, when deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment.

. . . .

[4] [Y]our task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

. . . .

[5] It is extremely important for you to realize that under the United States Constitution, the grand jury is independent of the United States Attorney and is not an arm or agent of the Federal Bureau of Investigation, the Drug Enforcement Administration, the Internal Revenue Service, or any governmental agency charged with prosecuting a crime. There has been some criticism of the institution of the Grand Jury for supposedly acting as a mere rubber stamp, approving prosecutions that are brought before it by governmental representatives. However, as a practical matter, you must work closely with the government attorneys. The United States Attorney and his Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal problems. It is entirely proper that you should receive this assistance. If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys.

*See also* Model Grand Jury Charge, *Report of the Proceedings of the Judicial Conference of the United States* 33 (March 12, 1986).[4]

Navarro-Vargas and Leon-Jasso contend that the grand jury's independence was compromised when it was instructed in paragraphs [3], [4], and [5] that it "should vote to indict" the accused in each case in which it believed probable cause

---

[4]Some federal jurisdictions also use a handbook to offer grand jurors further explanation of their power and duties. UNITED STATES JUDICIAL CONFERENCE COMMITTEE ON THE OPERATION OF THE GRAND JURY SYSTEM, HANDBOOK FOR FEDERAL GRAND JURORS, *at* www.moed.uscourts.gov/Jury/FederalHandbookForGrandJurors.pdf (last visited January 4, 2005); UNITED STATES JUDICIAL CONFERENCE COMMITTEE ON THE OPERATION OF THE GRAND JURY SYSTEM, FEDERAL GRAND JURY HANDBOOK (1980)). *See also* 4 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 15.2(e) (2d ed. 1999).

exists, that it could not "judge the wisdom of the criminal laws enacted by Congress," and that government counsel would use "candor, honesty, and good faith." The Appellants argue that this error is structural and requires dismissal of the indictment.

A divided panel of our court affirmed the convictions. 367 F.3d 896 (9th Cir. 2004). We vacated the panel's opinion and granted rehearing en banc. 382 F.3d 920 (9th Cir. 2004). We review Appellants' challenge to a denial of a motion to dismiss an indictment *de novo. United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000).

## II. CONSTITUTIONALITY OF THE GRAND JURY INSTRUCTIONS

[1] The Grand Jury Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." U.S. CONST. amend. V. The Clause is remarkably plain in its restrictions. It is also notable for what it does not say. The Clause presupposes much about grand juries.[5] It does not prescribe the number of jurors. It does not limit the grand jury's function to returning or refusing to return indictments. It does not state whether a person appearing before the grand jury may be accompanied by

---

[5]We take issue with the dissent's comment that the Fifth Amendment "says, plainly and simply, that no serious (felony) charge may be brought without the approval of a group of citizens . . . who are entirely free to charge what the government proposes, to charge differently, or to not charge at all." Dissent at 5559. This seems to beg the question and to read a lot into the words "Grand Jury." As we explain, we review the history of the grand jury and examine its place in constitutional structure precisely because the Fifth Amendment is not so "plain[ ] and simpl[e]" as to tell us what grand juries do or do not do, and whether Congress or the courts or the executive have any power to define that role.

counsel, whether the rules of evidence apply, or whether its proceedings may be disclosed for any purposes. *See*, *e.g.*, *United States v. Williams*, 504 U.S. 36, 55 (1992) (exculpatory evidence); *United States v. Mandujano*, 425 U.S. 564, 581 (1976) (plurality opinion) (right to counsel); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 398-99 (1959) (public disclosure); *United States v. Proctor & Gamble*, 356 U.S. 677, 681-82 (1958) (public disclosure); *Costello v. United States*, 350 U.S. 359, 363-64 (1956) (use of hearsay). The text of the Fifth Amendment simply provides for the right to indictment by a grand jury and does not explain how the grand jury is to fulfill this constitutional role. Either such details were assumed by the framers of the Bill of Rights or they decided to leave such details to Congress, the Executive, and the Judiciary. Congress, in fact, has provided for rules to govern grand jury proceedings. *See* 28 U.S.C. §§ 1861-63, 1870; Fed. R. Crim. P. 6, 7.[6] Some of the task of defining the

---

[6]"In the Process Act of 1789, Congress provided that the federal courts in common law actions would follow the common law procedures of the states in which they sat." Ellen E. Sward, *A History of the Civil Trial in the United States*, 51 U. Kan. L. Rev. 347, 379 (2003) (citing An Act to Regulate Processes in the Courts of the United States, ch. 21, § 2, 1 Stat. 93, 93-94 (Process Act of 1789, Sept. 29, 1789)). However, "[a]s the federal caseload grew in the late 1800s, procedural disuniformity created increasing problems." Robert J. Pushaw, *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 754-55 (2001). Congress responded with the Rules Enabling Act of 1934 ("REA"), which provides:

> [T]he Supreme Court . . . shall have the power to prescribe by general rules . . . the forms of process, writs, pleadings, and motions, and the practice and procedure in civil actions at law. Said rules shall not abridge, enlarge nor modify the substantive rights of any party.

Act of June 19, 1934, ch. 651, § 1, Pub. L. No. 73-415, 48 Stat. 1064 (current version at 28 U.S.C. § 2072(a)-(b)). The Supreme Court has upheld the REA and Congress's "undoubted power to regulate the practice and procedure of federal courts" which it may exercise consistently with "the statutes or Constitution of the United States." *Sibbach v. Wilson & Co.*, 312 U.S. 1, 9-10 (1941). Congress has used its REA authority to promulgate the Federal Rules of Criminal Procedure which regulates modern federal grand jury procedure. Pushaw, *supra*, at 756.

grand jury's function has also fallen to the courts. *See, e.g., Williams*, 504 U.S. at 50; *Calandra*, 414 U.S. at 349.**[7]**

The Court has observed that the grand jury is an "English institution, brought to this country by the early colonists and incorporated into the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." *Costello*, 350 U.S. at 362. Because the Constitution presumes a role for the grand jury, the Fifth Amendment must be linked to the grand jury's origins. We review briefly the history of the grand jury to understand its function and something of why "[h]istorically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution . . . [and] stand[s] between the accuser and the accused." *Wood v. Georgia*, 370 U.S. 375, 390 (1962).

**[2]** We look to history for guidance for another reason. The Supreme Court has held that the right to due process of law does not include, at a minimum, presentment or indictment by a grand jury. In *Hurtado v. California*, 110 U.S. 516 (1884), the Court held that the Due Process Clause of the Fourteenth Amendment does not guarantee indictment by a grand jury to

---

**[7]**The Supreme Court has been hesitant to create new rules of grand jury procedure, and has determined that Congress is best suited to prescribe rules. The Court noted in *Williams* that although a rule requiring the prosecutor to disclose exculpatory evidence to the grand jury may save judicial time, the court "need not pursue the matter . . . [because] if there is an advantage to the proposal, Congress is free to prescribe it." *Williams*, 504 U.S. at 55; *see also id.* at 67 n.10 (Stevens, J., dissenting) ("[T]he Court acknowledges that Congress has the power to regulate the grand jury, for it concedes that Congress "is free to prescribe" a rule requiring the prosecutor to disclose substantial exculpatory evidence to the grand jury."). *See also In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena*, 913 F.2d 1118, 1129 (5th Cir. 1990) (rejecting amici curiae's proposal that the court "promulgate detailed guidelines governing the enforcement of grand jury subpoenas against attorneys" since "[r]equests for general rules should be addressed to Congress or to the Judicial Conference of the United States").

state criminal defendants. *Id.* at 538. Since the Due Process Clauses of the Fifth and Fourteenth Amendments are coextensive, *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954), the Fifth Amendment does not, independent of the Grand Jury Clause, guarantee grand jury indictment in federal criminal cases. Whether the model grand jury instructions violate the Grand Jury Clause depends on what the Clause's cryptic reference to "Grand Jury" means and whether independence (in the sense advocated by the Appellants) is an irreducible element of what it means to have a grand jury. And for that inquiry, our starting point must be the grand jury's history, recognizing that any recounting of a near-millennia of history will give us only the broadest contours of an ancient institution.

## A.   *The Historical Role of Grand Jury*

### 1.   The Early English Grand Jury: Quasi-Prosecutor

The modern grand jury is a direct descendant of the English grand jury first employed more than 800 years ago.[8] *See United States v. Dionisio*, 410 U.S. 1, 17 n.15 (1973); *Costello*, 350 U.S. at 362; *Ex parte Bain*, 121 U.S. 1, 11 (1887). Its origins belie its modern role as intermediary between the people and their government. The earliest grand juries were the tool of the Crown. In 1164, anxious to consolidate power

---

[8]This historical summary is taken from 1 SARA SUN BEALE ET AL., GRAND JURY LAW AND PRACTICE § 1:1 (2d ed. 2001); MARVIN E. FRANKEL & GARY NAFTALIS, THE GRAND JURY: AN INSTITUTION ON TRIAL (2d ed. 1977); 1 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW (1922); 1 & 2 FREDERICK POLLOCK & FREDERIC W. MAITLAND, THE HISTORY OF ENGLISH LAW (2d ed. 1899); THEODORE F. T. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW (5th ed. 1956); RICHARD D. YOUNGER, THE PEOPLE'S PANEL: THE GRAND JURY IN THE UNITED STATES, 1634-1941 (1963); Ric Simmons, *Re-Examining the Grand Jury: Is there Room for Democracy in the Criminal Justice System?*, 82 B.U. L. REV. 1 (2002); Andrew D. Leipold, *Why Grand Juries Do Not (and Cannot) Protect the Accused*, 80 CORNELL L. REV. 260 (1995); and Helene E. Schwartz, *Demythologizing the Historic Role of the Grand Jury*, 10 AM. CRIM. L. REV. 701 (1972).

held by the church and feudal barons, King Henry II signed the Constitutions of Clarendon, which created a jury "to charge all laity who were to be tried in ecclesiastical courts. Two years later he established the Assize of Clarendon, which was composed of twelve men who would 'present' those suspected of crimes to the royal courts." Simmons, 82 B.U. L. REV. at 4. *See also* 1 HOLDSWORTH, *supra*, at 321-22. These acts reasserted the King's power over his subjects and filled his coffers with the proceeds from chattels confiscated after conviction.

During its first hundred years, the grand jury did not function as a shield to protect the accused, but as a sword to be wielded on behalf of the Crown. Indeed, the grand jury was "oppressive and much feared by the common people" because of its "unfettered power" and because the King would "manipulate the grand juries through suggestive instructions and fines levied against grand juries that failed to reach their quota of accusations." Schwartz, 10 AM. CRIM. L. REV. at 709; Simmons, 82 B.U. L. REV. at 6. In this sense, the English grand jury was somewhat like a quasi-prosecutor for the King. *United States v. Cox*, 342 F.2d 167, 186-87 (5th Cir. 1965) (Wisdom, J., concurring). Indeed, grand juries were expected to bring charges based on their own knowledge, as well as consider charges brought by prosecutors. A grand jury-initiated charge was a "presentment," while an "indictment" was prepared by the prosecutor and laid before the jury. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES 298-307 (1769) ("A presentment, *properly* speaking, is the notice taken by a grand jury of any offence from their own knowledge or observation, without any bill of indictment laid before them at the suit of the king."), *reprinted in* 5 THE FOUNDERS' CONSTITUTION 251 (P. Kurland & R. Lerner, eds. 1987). The distinction between presentment and indictment is reflected in the text of our Fifth Amendment.

The first real evidence of the grand jury acting as a shield to protect the accused was in 1681 when two London grand

juries refused to indict the Earl of Shaftesbury and his fol-
lower Stephen Colledge, the political enemies of King
Charles II. *The Trial of the Earl of Shaftesbury*, 8 How. St. Tr.
759, 771-74 (1681) *reprinted in* 5 THE FOUNDERS' CONSTITU-
TION 246-47; *The Trial of Stephen Colledge, at Oxford, for
High Treason*, 8 How. St. Tr. 549, 550 (1681). The King
wanted them held over for public proceedings before the
grand jury, but the grand jury insisted on conducting its
inquiry in private. Given its powerful influence, the Crown
expected a quick indictment pursuant to its charges. However,
the grand jury returned the equivalent of a no-bill in the mat-
ter, defying the Crown's will both in holding private proceed-
ings and in its ultimate decision not to indict.[9] The
Shaftesbury and Colledge cases established grand jury
secrecy, which continues to be a crucial element in grand
juries serving as an independent screen. As grand jury secrecy
became a matter of course, judges maintained less liberty to
"cross-examin[e] grand jurors about their findings." FRANKEL
& NAFTALIS, *supra*, at 10.

 2.  The Colonial Grand Jury: Quasi-Legislative, Quasi-
     Administrative

American colonists adopted the grand jury as integral to the
common law system. In one of the earliest codifications of the
grand jury's role, the Pennsylvania Frame of Government,
adopted in 1696, provided that

The form of Grand Inquest's attests shall be in these words,
viz:

---

[9]Insisting on the grand jury's right to deliberate secretly, one juror
defended his position, stating: "[I]n private [the grand jurors] are more
free to examine things in particular, for the satisfying their own con-
sciences, and that without favour or affection; and we hope we shall do
our duty." *The Trial of the Earl of Shaftesbury*, 8 How. St. Tr. 759, 771-
74 (1681) *reprinted in* 5 THE FOUNDERS' CONSTITUTION 246-47.

> Thou shalt diligently enquire, and true presentment make, of all such matters and things as shall be given thee in charge, or come to thy knowledge, touching this present service; the King's counsel, thy fellows and thy own, thou shalt keep secret, and in all things thou shalt present the truth, and nothing but the truth, to the best of thy knowledge.

The Frame of Government of the Province of Pennsylvania (1696), *reprinted in* 5 FRANCIS NEWTON THORPE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES 3072 (1909). In America, the institution gained broad powers to propose legislation and perform various administrative tasks. Grand juries "exercised broad, unorthodox powers," inspecting roads, jails, and other public buildings; monitoring public works expenditures, construction and maintenance; proposing new legislation; and criticizing poor administration. Simmons, 82 B.U. L. REV. at 10. The colonial grand jury still performed a quasi-prosecutorial role by accusing individuals suspected of crimes, but colonial grand juries demonstrated greater independence than their English counterparts, due in part to the relatively weak position of colonial governments. With their expanding quasi-legislative and quasi-administrative roles, grand juries acquired greater popularity because they were regarded as more representative of the people. "Through presentments and other customary reports, the American grand jury in effect enjoyed a roving commission to ferret out official malfeasance or self-dealing of any sort and bring it to the attention of the public at large," becoming, as James Wilson put it, a " 'great channel of communication, between those who make and administer the laws, and those for whom the laws are made and administered.' " AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 85 (1998) (quoting 2 THE WORKS OF JAMES WILSON 537 (R. McCloskey, ed. 1967)). Following the English traditions established in the Shaftesbury and Colledge cases, grand jury secrecy remained an important part of grand jury proceedings

in the colonies. Grand jurors pledged to an oath of secrecy, and its violation was both a contempt and a crime. BEALE, ET AL., *supra*, § 5:2 (citing 4 BLACKSTONE, COMMENTARIES at 226).

While Colonial grand juries continued to serve as accusatory bodies, they occasionally refused to return indictments in high-profile cases. The most celebrated example in American history is that of John Peter Zenger, a newspaper publisher charged with libel after criticizing the Governor of New York. Based on the jury instructions, it seems clear that Zenger was guilty of the crime of libel. Nevertheless, three grand juries refused to indict not because of insufficient evidence but rather because the jurors were politically opposed to the prosecutions. BEALE, ET AL., *supra*, § 1:3. *See also* YOUNGER, *supra*, at 28 (discussing the Boston grand juries who refused to indict editors of the Boston Gazette for libeling the governor of Massachusetts and refusing to indict leaders of the Stamp Act Rebellion).

As the Revolutionary War drew closer, the grand jury became popular "at least as much from its success as a political weapon as from its role in the criminal justice system." Leipold, 80 CORNELL L. REV. at 285. Colonial grand juries publicly called for boycotts of British goods, condemned British rule, criticized the use of the tea tax to pay British officials' salaries, and indicted British soldiers for breaking and entering into the homes of private citizens. Where the king's grand juries had once colluded with the king's prosecutors, in pre-Revolutionary America, colonial grand juries resisted the king's representatives in America. The historical division of authority between grand juries and prosecutors became a fissure exposing the political division between the colonists and their king. Grand jurors, selected from the public, frustrated prosecutors loyal to the king by refusing to indict those charged under unpopular laws imposed by the Crown, often on the urging of colonial judges.[10] Grand jury presentments

---

[10]Ralph Lerner, *The Supreme Court as Republican Schoolmaster*, 1967 SUP. CT. REV. 127, 134 (1967) (noting that before the Revolutionary War,

served an additional function during this time: they became "excellent mediums of propaganda" as grand juries issued "stinging denunciations of Great Britain and stirring defenses of their rights as Englishmen." YOUNGER, *supra*, at 34. In their presentments, colonial grand juries reported on matters of public interest and criticized public agencies or officials. BEALE, ET AL., *supra*, §§ 1:8, 2:1.[11]

Despite the apparent popularity of these acts of defiance, when the original colonies drafted their first state constitutions between 1776 and 1790, only three states guaranteed the right to a grand jury in their constitution.[12] Following the adoption of the U.S. Constitution, however, eight of the thirteen original states recommended an amendment to ensure the right to a federal grand jury. In early debates over the ratifica-

---

"Loyalist judges chastised grand juries for failing to make presentments and indictments against libelers and tea-burners and other local revolutionaries" and after the revolution state judges urged moderation in the treatment of Loyalists).

[11]*See* Lerner, 1967 SUP. CT. REV. at 134 (citing grand jury charge of Virginia Judge Richard Parker (June, 1798), printed in Palladium (Frankfort, Ky.), Oct. 23, 1798, at 2 (charging a grand jury "not [to] think of introducing politics" into a presentment and "to keep to the business of grand juries as defined by the state legislature")); David J. Katz, Note, *Grand Jury Charges Delivered by Supreme Court Justices Riding Circuit During the 1790s*, 14 CARDOZO L. REV. 1045, 1055-56 (1993) (even if the grand jury did not indict anyone, it often delivered a presentment to express the grand jury members' views about current events, opining, for example, on inadequate compensation for jury duty, urging the repeal of Excise laws which levied federal taxes on liquor distillation, the absence of a Bill of Rights from the Constitution, and the need to reduce the size of the federal judiciary).

[12]DEL. CONST. art. I, § 8 (1792), *reprinted in* 1 THORPE, *supra*, at 569; N.C. CONST., Decl. of Rights, art. VIII (1776), *reprinted in* 5 THORPE, *supra*, at 2787; PA. CONST. art. IX, § 10, *reprinted in* 5 THORPE, *supra*, at 3100. Two other state constitutions, while not guaranteeing the right to a grand jury, made reference to the grand jury or to indictment. GA. CONST. art. XLV (1777), *reprinted in* 2 THORPE, *supra*, at 784; N.Y. CONST. arts. XXXIII, XXXIV (1777), *reprinted in* 5 THORPE, *supra*, at 2635.

tion of the Constitution, before the Bill of Rights had been written, some feared that "there is no provision . . . to prevent the attorney-general from filing information against any person, whether he is indicted by the grand jury or not; in consequence of which the most innocent person in the commonwealth may be taken by virtue of a warrant issued in consequence of such information . . . ." Jon Van Dyke, *The Grand Jury: Representative or Elite?*, 28 HASTINGS L.J. 37, 39 (1976) (quoting Abraham Holmes of the Massachusetts legislature). Because of this fear, the Grand Jury Clause, located in the Fifth Amendment, was adopted with little debate or discussion. *Id.*

> 3.   The Post-Revolutionary and Nineteenth Century Grand
>      Jury: Screening Function

As they had in colonial times, nineteenth century grand juries occasionally asserted their independence by refusing to indict under unpopular laws, even when the grand jury was instructed to indict if the facts satisfied the law. Prominently, grand juries in Kentucky and Mississippi refused to indict former Vice President Aaron Burr, although he was finally indicted in Virginia; refused to indict Americans who aided French privateers in violation of the Neutrality Proclamation of 1793; and resisted indicting those accused of violating the controversial Alien and Sedition Acts. Throughout the nineteenth century, courts continued to recognize the necessity of secrecy in grand jury proceedings. *See United States v. Providence Tribune Co.*, 241 F. 524, 526 (D.R.I. 1917) (holding a newspaper in contempt for publishing a grand jury proceeding and noting that secrecy is essential to the proceedings of a grand jury). This secrecy allowed grand juries to independently determine whether to indict, despite a judge's instructions.

In many post-revolution cases, judges instructed the jurors to enforce federal laws, even if the jury thought the laws unjust or unconstitutional. Justice Chase instructed a Philadel-

phia grand jury that until a law is repealed, even if it is uncon-stitutional, every citizen has a duty to "submit to it." Katz, 14 CARDOZO L. REV. at 1058 (citing Grand Jury Charge (C.C.D. Pa. Apr. 12, 1800) (Chase, J.)), *in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-90: THE JUSTICES ON CIRCUIT: 1790-1794, at 408, 413 (Maeva Marcus ed., 1990) [hereinafter 3 DHSC]. Similarly, Chief Justice Jay explained that a grand juror, just like a judge, must apply the law of the land even if it is a subject of heated public debate as the duty to enforce the law must override "individual scru-ples and misgivings." Lerner, 1967 SUP. CT. REV. at 147 (cit-ing 3 JOHNSTON, CORRESPONDENCE AND PUBLIC PAPERS OF JOHN JAY 485 (1891)). Duty to submit to the laws was a common theme among grand jury charges contemporaneous with the adoption of the Bill of Rights.[13]

---

[13]Unidentified Grand Jury Charge No. 4 (Paterson, J.), *in* 3 DHSC at 462-64 (closing a grand jury charge with the instruction to "be obedient to the laws; let us fear God, respect our government, and honor the consti-tuted authorities of our country[ ]"). *See* Lerner, 1967 SUP. CT. REV. at 143 (noting the emphasis on duty in Chief Justice Jay's grand jury charge delivered in Richmond on May 22, 1793) (citing 3 JOHNSTON, CORRESPON-DENCE AND PUBLIC PAPERS OF JOHN JAY 478-85 (1891)); Katz, 14 CARDOZO L. REV. at 1056-57 (citing Grand Jury Charge (C.C.D.N.Y. Apr. 12, 1790)) (Jay, J.), *in* 2 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-90: THE JUSTICES ON CIRCUIT: 1790-1794, at 25, 30 (Maeva Marcus ed., 1988) [hereinafter 2 DHSC] (Justice Jay noted in a charge to a New York grand jury in 1790 that "civil liberty consists not in a Right to every Man to do just what he pleases . . . . It is the Duty and the Interest therefore of all good Citizens, in their several Stations, to sup-port the Laws and the Government which thus protect their Rights and Liberties[ ]") and Grand Jury Charge (C.C.D.S.C. May 12, 1794) (Iredell, J.), *in* 2 DHSC at 25, 26 (Justice Iredell spoke of an individual's duty "to conform his conduct to the same principles of neutrality" in a charge to a Columbia grand jury) and Grand Jury Charge (C.C.D.R.I. Nov. 7, 1794) (Cushing, J.), *in* 2 DHSC at 491, 492 (instructing a Providence grand jury defined liberty as the right "to do whatever just laws made by a free repre-sentative allow") and Grand Jury Charge (C.C.D.Pa. May 4, 1795) (Pater-son, J.), *in* 3 DHSC at 40, 42 (Justice Paterson stated in a charge to a Philadelphia grand jury that "[t]o reverence and obey the laws is the first political maxim and duty in a republican government . . . [and] civil liberty and order consist in and depend upon submission to the laws.")). *See also* BEALE, ET AL., *supra*, § 1:4 (noting that the jury charge was used "as an opportunity to describe the virtues of the new federal government, and to stress the importance of enforcing federal laws").

The conflict between Federalists and Republicans over the Alien and Sedition Acts proved particularly nettlesome and may be illuminating because it follows so closely on the adoption of the Bill of Rights. "From the first, the new federal judges regarded their addresses to grand juries as excellent opportunities to deliver political orations. Though grand jury charges originated for the purpose of instructing the jurors in their duties, judges had long used them as a means of disseminating political propaganda." YOUNGER, *supra*, at 47. Federalist judges, supporters of President John Adams and defenders of the Alien and Sedition Acts, took advantage of their right to instruct juries and "impress upon grand jurors the necessity for the strict enforcement of federal laws." *Id.* at 48. In a politically charged speech before a grand inquest, Chief Justice Francis Dana of Massachusetts denounced Jefferson and the Democratic Republican Candidates for Congress as "apostles of atheism and anarchy, bloodshed and plunder." *Id.* at 54. On the other hand, Republican judges, taking a "slap at partisan federal judges[,]" advised juries that their proper place was "as a strong barrier between the supreme power of the government and the citizens," rather than as an instrument of the state. *Id.* at 54-55 (quoting Judge Harry Innes). Nevertheless, these "partisan harangues . . . did not stampede jurymen into returning indiscriminate indictments on political grounds. Instead, jurors often reacted against the heated charges and refused to indict." *Id.* at 49.

The political potential in the screening function of the grand jury was also manifest during the Civil War era. Prior to the war, Southern grand juries readily indicted those involved in crimes related to abolition of the slave trade, while Northern grand juries were slow to indict those charged with violations of the fugitive slave laws. Following the Civil War, Southern grand juries frustrated enforcement of Reconstruction-era laws by refusing to indict Ku Klux Klan members and others accused of committing crimes against newly-freed blacks. "During the Reconstruction period, the grand jury served as a principal weapon of Southern whites in

their struggle against radical Republicans and Negro rights." FRANKEL & NAFTALIS, *supra*, at 14; YOUNGER, *supra*, at 85-86, 90-93 (describing Southern juries who took "seriously the task of maintaining control over slaves and free Negroes" including warning against increasing rights for free blacks and attempting to prevent antislavery literature and orators from entering their states). *See also* FRANKEL & NAFTALIS, *supra*, at 15 (describing controversial grand jury proceedings concerning such politically volatile issues as Mormon polygamy, the conflict between big business and labor unions, and resistance to "foreign radicalism").

### 4.   The Modern Grand Jury

By the twentieth century, dramatic confrontations between prosecutors and jurors in grand jury proceedings had become rare. Currently, grand jurors no longer perform any other function but to investigate crimes and screen indictments, and they tend to indict in the overwhelming number of cases brought by prosecutors.[14] Because of this, many criticize the modern grand jury as no more than a "rubber stamp" for the prosecutor. BEALE, ET AL., *supra*, § 1:1.[15] "Day in and day out,

---

[14]*See* Federal Justice Statistics Resource Center, Federal Justice Statistics Database, *at* http://fjsrc.urban.org (last visited January 5, 2005) (noting that federal grand juries returned only twenty-one no-bills in 2001).

At least one commentator notes that dismissals by grand juries may be underreported by prosecutors, and others comment that grand juries are serving as a more effective screen than it may seem. Simmons, 82 B.U. L. REV. at 32-34 (suggesting that dismissal rates may be underreported by prosecutors due to negligence or for fear that it could reflect poorly on the office).

[15]*See* Stuart Taylor, Jr., *End of the Grand Jury Charade*, AM. LAW., June 1992, at 32. *See also* Peter Arenella, *Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication*, 78 MICH. L. REV. 463, 474 (1980) (arguing that "the grand jury's tendency to rubberstamp the prosecutor's decisions stems far more from the limited role the Supreme Court has assigned to it and the type of evidence it receives than from any institutional incapacity"); William

the grand jury affirms what the prosecutor calls upon it to affirm — investigating as it is led, ignoring what it is never advised to notice, failing to indict or indicting as the prosecutor 'submits' that it should." FRANKEL & NAFTALIS, *supra*, at 22. Or, as the Supreme Court of New York so colorfully put it: "[M]any lawyers and judges have expressed skepticism concerning the power of the Grand Jury. This skepticism was best summarized by the Chief Judge of this state in 1985 when he publicly stated that a Grand Jury would indict a 'ham sandwich.' " *In re Grand Jury Subpoena of Stewart*, 545 N.Y.S.2d 974, 977 n.1 (Sup. Ct.), *aff'd as modified*, 548 N.Y.S.2d 679 (App. Div. 1989).[16]

As the grand jury's tendency to indict has become more pronounced, some commentators claim that the modern grand jury has lost its independence. Susan W. Brenner, *The Voice of the Community: A Case for Grand Jury Independence*, 3 Va. J. Soc. Pol'y & L. 67, 100 (1995) (noting that the grand jury's nullification power allows it to insert an "influential, accurate, and legitimate community voice" into the criminal process); Gregory T. Fouts, Note, *Reading the Jurors Their Rights: The Continuing Question of Grand Jury Independence*, 79 IND. L.J. 323, 324 (2004) (arguing that the grand jury is "no longer an independent body, but rather an arm of

---

J. Campbell, *Eliminate the Grand Jury*, 64 J. CRIM. L. & CRIMINOLOGY 174, 174 (1973) (arguing that the grand jury should be abolished; noting that "the grand jury is the total captive of the prosecutor who, if he is candid will concede that he can indict anybody at any time, for almost anything, before any grand jury"); Melvin P. Antell, *The Modern Grand Jury, Benighted Supergovernment*, 51 A.B.A. J. 153, 153-54 (1965) (asserting that the grand jury is an "archaic . . . instrument[ ]" that does little to safeguard defendants).

[16]It is very difficult to determine whether the grand jury's screening function has been successful. The high indictment rate may reflect caution on the part of federal prosecutors to bring marginal cases before a grand jury and suffer the return of a no-bill. Leipold, 80 CORNELL L. REV. at 273-78.

the prosecution"); Elizabeth G. Mckendree, Note, *United States v. Williams: Antonin's Costello: How the Grand Jury Lost the Aid of the Courts as a Check on Prosecutorial Misconduct*, 37 How. L.J. 49, 58, 80-82 (1993) (claiming that the "contemporary grand jury falls far short of its historic ideal" and arguing that the judiciary is the branch that should protect the grand jury's independence).

Against this criticism, the Supreme Court has steadfastly insisted that the grand jury remains as a shield against unfounded prosecutions. *See Williams*, 504 U.S. at 47 (the Grand jury "serv[es] as a kind of buffer or referee between the Government and the people"); *Mandujano*, 425 U.S. at 571 (plurality opinion) ("the grand jury continues to function as a barrier to reckless or unfounded charges"); *Wood*, 370 U.S. at 390 (describing the grand jury as a "primary security to the innocent against hasty, malicious and oppressive persecution" as it stands "between the accuser and the accused . . . to determine whether a charge is founded upon reason or . . . dictated by an intimidating power by malice and personal ill will[ ]"); *Stirone v. United States*, 361 U.S. 212, 218 (1960); *Hale v. Henkel*, 201 U.S. 43, 61 (1906). *See also Branzburg v. Hayes*, 408 U.S. 665, 686-87 (1972) (recognizing the dual function of the grand jury "of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions."). *But see Dionisio*, 410 U.S. at 17 ("The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor . . . .").

5. The Model Charge

The first model grand jury charge was issued in 1978 by the Judicial Conference of the United States.[17] Model Grand

---

[17]No uniform federal handbook or model instructions for grand juries existed until the 1970s. In 1974, the Judicial Conference Committee on the

Jury Charge, *Report of the Proceedings of the Judicial Con-*
*ference of the United States* 77 (September 21, 1978). The
original model charge is very similar to the one used by fed-
eral judges today, and includes all of the phrases challenged
by Appellants as unconstitutional. Model Charge to Grand
Juries, *Report of the Committee on the Operation of the Jury*
*System* 3, 5, 15 (September 1978). In 1986, the Judicial Con-
ference revised and shortened the model grand jury charge.
Model Grand Jury Charge, *Report of the Proceedings of the*
*Judicial Conference of the United States* 33 (March 12, 1986).
This is the most recent revision of the model charge and con-
tains the phrases to which Appellants have objected here. *Id.*
at A-4, A-6, A-12.[18]

At least nine states have addressed issues similar to those

---

Operation of the Jury System published a *Handbook for Federal Grand*
*Jurors* at the direction of the Judicial Conference of the United States.
UNITED STATES JUDICIAL CONFERENCE COMMITTEE ON THE OPERATION OF THE
GRAND JURY SYSTEM, HANDBOOK FOR FEDERAL GRAND JURORS (1974). This
handbook was designed to explain the general nature of the duties of grand
juries and of "the institution on which they will serve." *Id.* at 4. It was not
designed to replace the instructions given by federal judges but only to
supplement them. *Id.* In 1977, the Judicial Conference and the Congressio-
nal Committee on the Administration of the Criminal law agreed that there
should be a model grand jury charge promulgated. Grand Jury Reform,
*Report of the Proceedings of the Judicial Conference of the United States*
84 (September 15, 1977). *See also* Model Charge to Grand Juries, *Report*
*of the Committee on the Operation of the Jury System* 20 (March 1978).

[18]There is another model grand jury charge in circulation that has not
been approved by the Judicial Conference. It is located in the *Benchbook*
*for U.S. District Court Judges*. It claims to be "substantially the same in
form" as the one approved by the Judicial Conference in 1986, but it does
not contain any of the three phrases challenged as unconstitutional. *See*
FEDERAL JUDICIAL CENTER 1996, BENCHBOOK FOR U.S. DISTRICT COURT
JUDGES § 7.04 204 n.1 (4th ed. 2000 rev.). Even this instruction states that
"the purpose" and "task" of the grand jury is "to determine whether there
is sufficient evidence . . . to determine if there is 'probable cause' to
believe the person committed a crime." *Id.* at 205. It is unclear what per-
centage of district courts use this model charge as opposed to the one
issued by the Judicial Conference in 1986.

before us and have arrived at different conclusions. The majority of the states have adopted instructions similar to the federal model instructions. Florida's instructions expressly instruct the grand jury that it "should vote to return a 'true bill' " if it finds " 'probable cause' that a crime has been committed[.]" 31 Florida Grand Jury Instructions, FLORIDA STANDARD JURY INSTRUCTIONS IN CRIMINAL CASES § 2.6 (4th ed. 2004). Hawai'i's model charge instructs jurors that "[i]f the answer is "yes," [that probable cause exists] then "you are to return . . . an indictment." Hawai'i Model Grand Jury Charge 11.[19] Virginia's model charge uses even stronger language in instructing that if there is probable cause that a law has been violated, it is the grand jury's "positive and sworn duty to indict." Regular Grand Jury Instructions, 1-1 VIRGINIA CRIMINAL BENCHBOOK FOR JUDGES AND LAWYERS 1 (2004). Similarly, Massachusetts' model charge instructs the grand jury that if the jurors believe "sufficient evidence" is presented, "it is your duty to return . . . an indictment." Massachusetts Grand Jury: General Instructions 2 (December 1993). Ohio's model grand jury instructions state that indictments "shall be returned against those who are probably guilty of criminal acts." 4 Ohio Jury Instructions § 401.04 (2003). In California, by statute, "a grand jury *shall* find an indictment when all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, warrant a conviction by a trial jury." CAL. PENAL CODE § 939.8 (West 2005) (emphasis added).

---

[19]Florida's instructions also instruct the grand jury that its duty is "only" to determine whether there is probable cause. 31 Florida Grand Jury Instructions, FLORIDA STANDARD JURY INSTRUCTIONS IN CRIMINAL CASES § 2.4 (4th ed. 2004). Hawai'i, Massachusetts, and Minnesota's instructions similarly refer to the "purpose" and "function" of the grand jury as a singular task. Hawai'i Model Grand Jury Charge 1; Massachusetts Proposed Grand Jury Charge 3 (April 11, 2003); Grand Jury Charge, Fourth Judicial District Court State of Minnesota, *at* http://www.courts.state.mn.us/districts/fourth/Jury/jogjchg.htm (last visited March 9, 2005).

By contrast, in two states, New York and Minnesota, the model grand jury instructions use language stating that the grand jury "may" indict if the government proves its case rather than "should" indict. *See, e.g.*, New York State Office of Court Administration, Criminal Jury Instructions New York (2d ed. rev. June 10, 2002), *at* http://www.nycourts.gov/ cji/1-General/CJI2d.Grand-Jury.Revised.pdf (last visited March 9, 2005); Grand Jury Charge, Fourth Judicial District Court State of Minnesota, *at* http://www.courts.state.mn.us/ districts/fourth/Jury/jogjchg.htm (citing MINN. R. CRIM. P. 18.06, subd. 2). *But see* BEALE, ET AL., *supra*, § 9.10 (discussing differences between New York and the U.S. procedures).[20] The Minnesota instruction goes further to instruct the grand jury that it "is not obliged to return an indictment, even though you find there is probable cause, if you do not feel there is a reasonable prospect of a conviction." Grand Jury Charge, Fourth Judicial District Court State of Minnesota, *at* http://www.courts.state.mn.us/districts/fourth/Jury/ jogjchg.htm. In addition, Arkansas' model charge broadly instructs the grand jury that it is to "inquire into all public offenses committed in this county and to indict such persons whom you think guilty." 1 ARKANSAS' CIRCUIT JUDGES' BENCHBOOK FOR CRIMINAL AND CIVIL DIVISIONS app. 58 (rev. Oct. 2, 2003).

Finally, we note that a number of courts have considered whether *petit* juries should be informed of their nullification power. The courts have uniformly rejected the idea. *See United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1992) (determining that a district court did not err in refusing to provide a jury nullification instruction); *United States v. Trujillo*,

---

[20]On the other hand, the only state court (New York) we are aware of that has confronted the issue of grand jury nullification refused to decide whether the grand jury has the power to nullify the law. *People v. Jose C.*, 487 N.Y.S.2d 499, 502 (Sup. Ct. 1985) ("Neither is this court deciding whether our grand juries possess or lack the power 'to nullify the law by refusing to indict notwithstanding the presentation to it of evidence sufficient to sustain an indictment.' ") (internal citation omitted).

714 F.2d 102, 105-06 (11th Cir. 1983) ("While a jury does have the power to bring a verdict . . . its duty is to apply the law as interpreted and instructed by the court.") (internal citations omitted); *United States v. Dougherty*, 473 F.2d 1113, 1137 (D.C. Cir. 1972) ("An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal structure requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny"); *United States v. Boardman*, 419 F.2d 110, 116 (1st Cir. 1969) ("Today jurors may have the power to ignore the law, but their duty is to apply the law as interpreted by the court, and they should be so instructed."); *United States v. Moylan*, 417 F.2d 1002, 1005-09 (4th Cir. 1969); *People v. Fernandez*, 26 Cal. App. 4th 710, 712 (1994) ("We hold that the trial court did not have to advise the jury of its power to nullify a verdict"); *People v. Partner*, 180 Cal. App. 3d 178, 186 (1986) ("We agree that the jury should not be instructed on so-called jury nullification.").

We have reviewed, briefly, the history of the grand jury in an effort to understand something about its role and historic independence. The historical record is decidedly checkered; the role of the grand jury has alternatively expanded and contracted since it was instituted in the twelfth century.[21] The colonial grand jury had the broadest powers as a quasi-legislative, administrative and prosecutorial institution, bringing charges, screening indictments brought by prosecutors, supervising public projects, and proposing legislation. In both

---

[21]The dissent accuses the majority of "relying principally upon British history and the use of the grand jury in England prior to King George III" to distort "a uniquely American institution." Dissent at 5558. The grand jury is, of course, not "uniquely American." Its independence was reinforced during the colonial period, but its core functions were defined in the English experience. Contrary to the dissent, the Supreme Court has observed that "[t]here is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." *Costello*, 350 U.S. at 362. We have reviewed both English and American history to understand those core functions and their origins.

pre- and post-revolutionary America, the grand jury was used by prosecutors and judges as a political tool for, alternately, indicting or refusing to indict individuals who were accused of violating unpopular or controversial laws. While we celebrate grand jury independence in defense of the First Amendment in the case of Peter Zenger and those accused of violating the Alien and Sedition Acts, and we praise grand jury resistance to the morally-obnoxious fugitive slave laws, we must acknowledge as well that grand juries have also refused to enforce lawful and wise legislation, including some of the most important legislation in American history: the Reconstruction laws implementing the Thirteenth, Fourteenth, and Fifteenth Amendments. Grand jury independence, evidently, has historically served causes both good and ill.

Looking over this record, we observe that the weight of U.S. history favors instructing the grand jury to follow the law without judging its wisdom. We candidly admit, however, that the evidence is not overwhelming and the record is not uniform in this regard. We are left to consider the role of federal grand juries on the terms on which the Constitution gave us the right in the first place: by understanding the grand jury's place in the larger structure of our tripartite system.

B.   *The Structural Role of the Grand Jury*

The grand jury belongs to no branch of government, but is a "constitutional fixture in its own right." *Williams*, 504 U.S. at 47. Although no branch may control the grand jury, each branch enjoys some power to direct or check the grand jury's actions. "[T]radition and the dynamics of the constitutional scheme of separation of powers define a limited function for both court and prosecutor in their dealings with the grand jury." *United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir. 1977). The Fifth Amendment's guarantee to indictment by a grand jury "presupposes an investigative body 'acting independently of either prosecuting attorney or judge' whose mission is to clear the innocent, no less than to bring to trial those

who may be guilty." *Dionisio*, 410 U.S. at 16-17 (footnote omitted) (quoting *Stirone*, 361 U.S. at 218). Thus,

> the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials.

*Calandra*, 414 U.S. at 343.

The grand jury does not belong to the judicial branch, but it is "subject to the supervision of a judge" in some respects. *Branzburg*, 408 U.S. at 688. The court summons the grand jury and ensures that it is properly constituted. FED. R. CRIM. P. (6)(a)(1). The district court may extend the grand jury's service or discharge it. *Id.* 6(g). The grand jury may subpoena testimony, but it depends on the judiciary for enforcement, and the court may decline enforcement and quash the subpoena. *Calandra*, 414 U.S. at 346 n.4. The grand jury may be "clothed with great independence in many areas, but it remains an appendage of the court, powerless to perform its investigative functions without the court's aid, because powerless itself to compel the testimony of witnesses." *Brown v. United States*, 359 U.S. 41, 49 (1959), *overruled in part by Harris v. United States*, 382 U.S. 162 (1965).

On the other hand, the grand jury, while not within the executive branch, shares investigative duties with federal prosecutors. *See Butz v. Economou*, 438 U.S. 478, 510 (1978) ("[T]he public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.") (interior quotations and citations omitted). Indeed, in some respects, the grand jury

has even broader latitude than prosecutors. Grand jurors "may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge" in making its decisions. *Dionisio*, 410 U.S. at 15. The privilege of acting on "their own personal knowledge" is, of course, a vestige of the earliest grand juries, which were expected to bring their own charges, and it is reflected in the Fifth Amendment's reference to "presentment."

Grand juries and prosecutors serve as a check on one another. The grand jury, acting on its own information, may return a presentment, may request that the prosecutor prepare an indictment, or may review an indictment submitted by the prosecutor. The prosecutor has no obligation to prosecute the presentment, to sign the return of an indictment, or even to prosecute an indictment properly returned. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("[W]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (assuming probable cause exists, the decision of whether and what to charge "rests entirely in [the prosecutor's] discretion"); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("Executive Branch has exclusive and absolute discretion to decide whether to prosecute a case"); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1869) ("Public prosecutions, until they come before the court to which they are returnable, are within the exclusive discretion of the district attorney"); *Cox*, 342 F.2d at 182 (Brown, J., concurring); *id*. at 193 (Wisdom, J., concurring). Similarly, the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor. The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense — all on the basis of the same facts." *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986). And, significantly, the grand jury may refuse to return an indictment even "where a

conviction can be obtained." *Id.* (citing *United States v. Ciambrone*, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)).

The grand jury's discretion — its independence — lies in two important characteristics: the absolute secrecy surrounding its deliberations and vote and the unreviewability of its decisions. At least since the seventeenth century, the grand jury has deliberated in secret, and neither the judge nor the prosecutor may question the grand jury's findings, conclusions, or motives. In fact, the 1974 version of the Federal Handbook for Grand Jurors notes that "[t]he secrecy imposed upon grand jurors is a major source of protection for them." UNITED STATES JUDICIAL CONFERENCE COMMITTEE ON THE OPERATION OF THE GRAND JURY SYSTEM, HANDBOOK FOR FEDERAL GRAND JURORS 14 (1974). With this instruction, the *Handbook* seems to recognize that secrecy is part of the reason that grand jurors have immunity for actions brought against them in their capacity as grand jurors. Today, under Federal Rule of Criminal Procedure 6(e)(7), grand jurors may not disclose their deliberations or vote, on penalty of imprisonment. *See* 18 U.S.C. § 401.

The grand jury's decision to indict or not is unreviewable in any forum; its decision is final. *See Costello*, 350 U.S. at 362-63 (" 'No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence' ") (quoting *United States v. Reed*, 27 Fed. Cas. 727, 738 (C.C.N.D.N.Y. 1852)). *See also United States v. Bruce*, 394 F.3d 1215, 1231 (9th Cir. 2005) ("[W]e may not presume to correct the decisions of the grand jury . . . except through our judgments, any more than we can, except through our judgments, correct the prosecutorial decisions of the executive."). It is true that the district court may convene another grand jury and the prosecutor may seek another indictment, but there is no check on the grand jury's refusal or failure to return an indictment. Like other officers of the court, the grand jury enjoys absolute

immunity from civil or criminal suit for its acts, which prevents any inquiry into the grand jury's motivations. *See Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976) (Grand jurors possess absolute immunity because like a judge they must "exercise a discretionary judgment on the basis of evidence presented to them."); *Yaselli v. Goff*, 12 F.2d 396, 403 (2d Cir. 1926) (Grand jurors and other judicial officers are not liable "in a civil suit for a judicial determination, however erroneous it may be, and however malicious the motive which has produced it."). *See, e.g., Turpen v. Booth*, 56 Cal. 65 (1880); *Hunter v. Mathis*, 40 Ind. 356 (1872). It is the fact that its judgments are unreviewable and its deliberations unknowable that gives the grand jury its independence.

Indeed, the grand jury is uniquely unaccountable; grand jurors are insulated from public oversight in ways that no other government instrumentality is. Judges must issue their decisions on the public record; prosecutors must inform the accused of the nature of the charges and conduct a public trial. U.S. CONST. amend. VI. Decisions by judges and prosecutors are subject to review and public criticism; and, in extreme cases, judges and executive officers may be impeached for their decisions and, if convicted, removed from office. U.S. CONST. art. I, § 3, cl. 7. Grand juries are not subject to these constraints. The grand jury that refused to indict the Earl of Shaftesbury insisted on keeping its deliberations secret and thus avoided the king's retribution. The American jury that refused to indict Peter Zenger could do so because there was no retort to its response of "no bill." And grand jurors who failed to indict those critical of the President under the Alien and Sedition Acts were free to do so in defiance of their instructions precisely because there was no recrimination or inquiry to be had into their acts. Their names — unlike the subjects of investigation, the prosecutors, and instructing judges — are lost to history.[22]

---

[22]Moreover, because grand jury proceedings are secret, we can only speculate as to the motives for these grand juries refusing to return the

Grand jury independence is a two-edged sword, of course, because the same privilege is due grand jurors who refuse to indict for violations of civil rights laws or who take into account the race or gender of the accused or the victim when deciding to return a no bill. In all of these cases, for better or for worse, it is the *structure* of the grand jury process and its *function* in our system that makes it independent.[23]

### C.  *Appellants' Objections to the Model Instructions*

With this in mind, we turn to the Appellants' arguments. They challenge three instructions that in their view "demean" the grand jury's historical responsibility. Appellants do not ask us to rewrite the instructions in any particular way, but they suggest that no instruction would be better than an incorrect instruction. We consider each challenged instruction in turn.

### 1.  "The Wisdom of the Criminal Laws"

Navarro-Vargas and Leon-Jasso first challenge the passage that states:

You cannot judge the wisdom of the criminal laws

---

indictments. In fact, the model charge being challenged here specifically instructs grand jurors that they "may not disclose the contents of [their] deliberations and the vote of any juror even to government attorneys." *See also* FEDERAL JUDICIAL CENTER 1996, BENCHBOOK FOR U.S. DISTRICT COURT JUDGES § 7.04 (4th ed. 2000 rev.).

[23]"Given the 'almost invariable assumption of the law that jurors follow their instructions,'" instructing a grand jury not to judge the wisdom of Congress's laws hardly "undermines the very structural protections" of the institution. *Cf.* Dissent at 5568 (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). Instead, that "invariable assumption" is an illustration of the grand jury's independence: We must *presume* that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.

enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you.

Appellants contend that this passage unconstitutionally misinstructs the grand jury as to its role and function. They assert that no authority supports the district court's decision to circumscribe the subject matter of the grand jurors' inquiries and deliberations. According to Appellants, this limitation "run[s] counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules." Br. of Appellant at 7 (citing *Costello*, 350 U.S. at 364). In addition, Appellants argue that federal courts have limited powers to fashion rules of grand jury procedure and that they cannot use this power to reshape the grand jury institution, "substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself." Br. of Appellant at 8 (citing *Williams*, 504 U.S. at 50). They further contend that since the grand jury has the power to charge greater or lesser offenses, *Vasquez*, 474 U.S. at 263, it can surely judge the wisdom of a particular law in determining whether to indict. Appellants submit that this faulty instruction constitutes structural error requiring dismissal of the indictment. *Cf. Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1988).

**[3]** We first wish to observe that the instruction is not contrary to any long-standing historical practice surrounding the grand jury. We know of no English or American practice to advise grand juries that they may stand in judgment of the wisdom of the laws before them. Indeed, there is strong evidence to support the current instruction. We have previously cited the attestation or oath required of grand jurors in an early and influential colonial constitution which enjoined the jurors to "diligently enquire and true presentment make, of all such matters and things as shall be given thee in charge, or come to thy knowledge." *See* 5 THORPE, *supra*, at 3072. We

have also cited evidence of charges given shortly after the adoption of the Bill of Rights in which federal judges charged grand juries with a duty to submit to the law and to strictly enforce it. *See supra* note 13.

The phrase "wisdom of the laws" is not a term of art. We might assume that the phrase means that juries cannot question whether the law represents good policy. If a grand jury can sit in judgment of wisdom of the policy behind a law, then the power to return a no bill in such cases is the clearest form of "jury nullification."[24] The "wisdom of the laws" might also refer to a broader power of substantive constitutional review — the power to determine that the law is unconstitutional and, therefore, void. AMAR, *supra*, at 98 & n.64. *See Marbury v. Madison*, 5 U.S. 137, 180 (1803) ("[A] law repugnant to the constitution is void . . . [and] courts, as well as other departments, are bound by that instrument."). We doubt that the grand jury is particularly well suited to make either of these judgments, although, as we discuss below, there is no check on the ability of the grand jury to do so. The grand jury can only choose to indict or not in the cases before

---

[24]The popular phrase "jury nullification" curiously echoes arguments by James Madison and Thomas Jefferson for state nullification of congressional acts, arguments that we have long since rejected. The resolutions drafted by Madison and Jefferson supported, of course, Virginia and Kentucky's claims that the Alien and Sedition Acts violated the First Amendment. Kentucky Resolutions of 1798 and 1799 *in* 4 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 545 (2d ed. 1888); Virginia Resolutions of 1798 *in* 4 ELLIOT, *supra*, at 528. Any question of state nullification was resolved against the states in *Marbury v. Madison*, 5 U.S. 137 (1803), which established the Court as the "final arbiter of the Constitution." Christian G. Fritz, *Alternative Visions of American Constitutionalism: Popular Sovereignty and the Early American Constitutional Debate*, 24 HASTINGS CONST. L.Q. 287, 346-47 (1997). Even at the time of the Resolutions, no other state endorsed them and "several Federalist legislatures replied with strongly nationalist resolutions denying the right of state assemblies to pass on the validity of federal statutes." H. Jefferson Powell, *The Original Understanding of Original Intent*, 98 HARV. L. REV. 885, 926 (1985).

it. It cannot make judgments about any other cases, and since the jurors' deliberations are secret, no judge, prosecutor, or grand jury can rely on its reasoning in the future. Furthermore, the grand jury has few tools for informing itself of the policy or legal justification for the law; it receives no briefs or arguments from the parties. The grand jury has little but its own visceral reaction on which to judge the "wisdom of the law."

**[4]** By contrast, if the president or the attorney general determines that a law is either unwise or unconstitutional, he may decline to enforce the law and will do so systematically and, often, publicly. 28 U.S.C. § 530D(a) (requiring notice to Senate of Department of Justice's decision not to defend an act of Congress). *See also Cox,* 342 F.2d at 182 (Brown, J., concurring); *id.* at 193 (Wisdom, J., concurring). And, as we have noted, he is answerable for his judgment. Similarly, if a court finds that a law is unconstitutional, the judgment extends to all cases within the court's jurisdiction, and the decision is public and subject to review. The grand jury is, by design, isolated from other influences. The prospect of a grand jury here and there deciding for itself that a law lacked "wisdom" is an invitation to lawlessness and something less than the equal protection of the laws.[25] *See* AMAR, *supra,* at 103 ("[Accepting the] argument for jury review would have vested in fundamentally local bodies a power that approached de facto nullification in a wide range of situations. Existence of such a power in local bodies to nullify Congress's Reconstruction statutes might have rendered the Civil War Amendments a virtual dead letter."); FRANKEL & NAFTALIS, *supra,* at 23 ("[I]t is not profitable to mourn the grand jury's 'loss' of

[25]The dissent demonstrates the problem when it notes that it is "conceivable that a grand jury made aware of its role as 'conscience of the community' would have provided 'relief where strict application of the law would prove unduly harsh.' " Dissent at 5572 (quoting *Gaither v. United States,* 413 F.2d 1061, 1066 n.6 (D.C. Cir. 1969)). While there will always be risks that grand juries will behave inconsistently, the Grand Jury Clause does not require that we invite such caprice.

independence [because] an independent grand jury would be intolerable[.]”).

We recognize and do not discount that some grand jurors might *in fact* vote to return a no bill because they regard the law as unwise at best or even unconstitutional. For all the reasons we have discussed, there is no *post hoc* remedy for that; the grand jury’s motives are not open to examination. Moreover, there is no *ex ante* solution either; there is nothing to prevent a grand jury from engaging in nullification or substantive constitutional review, not even the model grand jury instructions. History demonstrates that grand juries do not derive their independence from a judge’s instruction. Instead, they derive their independence from an unreviewable power to decide whether to indict or not.

**[5]** The question before us is whether judging the wisdom of the law is so integral to the role of the grand jury that it is constitutional error for the district court to instruct against it. We cannot say that the instruction is so contrary to the grand jury’s role that it violates the Fifth Amendment. Or, put another way, we cannot say that the grand jury’s power to judge the wisdom of the laws is so firmly established that the district court must either instruct the jury on its power to nullify the laws or remain silent.

2.   “Should” Indict if Probable Cause Is Found

Navarro-Vargas and Leon-Jasso also claim that the following passage misinstructs the grand jury:

> [Y]our task is to determine whether the government’s evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person’s

believing that the accused is probably guilty of the offense with which the accused is charged.

Appellants claim that this passage is unconstitutional because it instructs grand jurors that they "should" indict if they find probable cause, but does not explain that they can refuse to indict even if they find probable cause. Further, Appellants argue that the instructions use the singular terms "purpose"[26] and "task" in advising the grand jurors that their sole responsibility is to make probable cause determinations. Even though the instructions indicate that the jurors "should" indict if they find probable cause, Appellants believe that the model charge reasonably read, imposes upon the grand jury a *duty* to indict if they find probable cause. Appellants argue that this improper instruction deprives them of the "traditional functioning of the institution that the Fifth Amendment demands." Br. of Appellants at 18 (citing *Williams*, 504 U.S. at 51).

**[6]** This instruction does not violate the grand jury's independence. The language of the model charge does not state that the jury "must" or "shall" indict, but merely that it "should" indict if it finds probable cause. As a matter of pure semantics, it does not "eliminate discretion on the part of the grand jurors," leaving room for the grand jury to dismiss even if it finds probable cause. *Marcucci*, 299 F.3d at 1159.[27]

---

[26]The singular term "purpose," referred to by Appellants, is used earlier in the model charge:

> The purpose of a Grand Jury is to determine whether there is sufficient evidence to justify a formal accusation against a person. If law enforcement officials were not required to submit to an impartial Grand Jury proof of guilt as to a proposed charge against a person suspected of having committed a crime, they would be free to arrest and bring to trial a suspect no matter how little evidence existed to support the charge.

[27]The first model grand jury charge approved by the Judicial Conference left even less room for the grand jury to exercise its discretion. It instructed the grand jury: "It is your duty to see to it that indictments are returned against those who you find probable cause to believe are guilty and not against the innocent." Model Charge to Grand Juries, *Report of the Committee on the Operation of the Jury System* 3 (September 1978).

**[7]** Even assuming that the grand jury should exercise something akin to prosecutorial discretion, the instruction does not infringe upon that discretion. The analogy that the Court recognized between the grand jury and the prosecutor is useful for understanding the source of both the grand jury's and prosecutor's discretion. *See Economou*, 438 U.S. at 510. Under Article II, § 3, the president "shall take Care that the Laws be faithfully executed." That duty can be delegated to subordinates, including the attorney general and the U.S. attorneys serving in each judicial district. *Myers v. United States*, 272 U.S. 52, 163-64 (1926) ("[A]rticle 2 grants to the President the executive power of the government — i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers — a conclusion confirmed by his obligation to take care that the laws be faithfully executed[.]"); *Ponzi v. Fassenden*, 258 U.S. 254, 262 (1922). U.S. attorneys, operating with limited resources, are literally incapable of seeing that each and every federal law is executed. Allocating their resources, they decide whether those resources are better put to prosecuting narcotraficantes, 21 U.S.C. § 1906; government fraud, 18 U.S.C. § 1031, and public corruption, 18 U.S.C. § 666; or to pursuing unlawful transportation of dentures, 18 U.S.C. § 1821; disruption of zoos, circuses, and rodeos, 18 U.S.C. § 43; or parking violations committed on federal lands, 36 C.F.R. § 4.13. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) (The government relies on "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan" in determining which cases to prosecute.); LaFave, et al., *supra*, § 13.2(d) (pointing out that with the great assortment of crimes and limited government resources often prosecutors are choosing who "will" be prosecuted rather than who will not be prosecuted). It is also possible that an attorney general might decide not to enforce, or at least to underenforce, politically controversial laws or laws that, in the attorney general's view, are unconstitutional. In effect, a decision

not to prosecute someone who would likely be indicted and could be convicted is a form of prosecutorial nullification. *See Cox*, 342 F.2d at 169-70 (Attorney General instructed U.S. Attorney not to seek indictment even though the grand jury voted to indict and the district court placed him under civil contempt of court for refusing to indict.).

Notwithstanding Article II's instruction to take care that the laws are faithfully executed, the president and those who represent him have broad independence in their prosecutorial decisions. The president's independence arises not out of any constitutional direction to exercise prosecutorial discretion, prosecutorial nullification, or substantive constitutional review, but out of the lack of any check on the president's ability to do so. The president operates virtually without check on decisions not to charge violations. There are, of course, long-term checks on the president. Congress has broad powers of inquiry and may, if necessary, impeach a president for his decisions. In extreme cases, courts may make judgments about selective prosecutions that violate the promise of due process or equal protection of the laws. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (The equal protection component of the Due Process Clause of the Fifth Amendment prohibits selective prosecutions based on "race, religion, or other arbitrary classification[.]"); *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996). The people have a check by bringing political pressure on the president and, if the president seeks a second term, to offer a referendum vote at the ballot box on the president's judgment in enforcing the laws.

In this respect, the grand jury has even greater powers of nonprosecution than the executive because there is, literally, no check on a grand jury's decision not to return an indictment. The grand jury has no accountability at the ballot box, before Congress, the President, or the courts. The grand jury's duty to follow the Constitution is no less than the President's duty to take care that the laws are faithfully executed. It is the grand jury's position in the constitutional scheme that gives

it its independence, not any instructions that a court might offer.

**[8]** Even though the terms "purpose" and "task" are singular, conveying that the grand jury has one purpose, these instructions do not undermine the grand jury's purpose and function. The instructions remind the grand jury that it has "extensive powers" and in "a very real sense stand[s] between the government and the accused." Admittedly, the instructions do not explain to the grand jury what its "extensive powers" are or have been in the past, including its power to refuse to indict even when a conviction can be obtained. However, the instructions remind the grand jury of its independence from the federal government and leave room for it to refuse to indict. Consequently, we conclude that this instruction is not inconsistent with the Fifth Amendment.

3.  The "Candor, Honesty, and Good Faith" of Government Attorneys

Finally, Appellants claim that the following passage inappropriately instructs the grand jury:

> The United States Attorney and his Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal problems. It is entirely proper that you should receive this assistance. If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys.

Appellants claim that this vote of confidence by the judge to the honesty of the government attorneys further undermines the independence of the grand jury. They argue that the grand jury is told to independently evaluate probable cause but that

this independence is diluted by this instruction that encourages deference to prosecutors.[28]

[9] We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution. The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. The contested passage may be surplusage, but it is not unprecedented. Apparently, these laudatory comments about the prosecutor have been included in grand jury materials for some time. Model Grand Jury Charge, *Report of the Proceedings of the Judicial Conference of the United States* A-12 (March 12, 1986); Model Grand Jury Charge, *Report of the Proceedings of the Judicial Conference of the United States* 15 (September 21, 1978) ("If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith efforts in every matter presented by the government."). *See also Cox*, 342 F.2d at 177 (Rives, Gewin, and Bell, J., concurring in part and dissenting in part) (quoting The Manual for Grand Jurors, Cong. Rec. A1115, (Feb. 21, 1952) (noting that the U.S. Attorney is "an intelligent, experienced individual acting in all sincerity" but that "he is from the viewpoint of the grand jury, only a lawyer, an agent of the Federal Department of Justice and by law he is the only legal advisor to the grand jury"). The instructions balance the praise for the government's attorney by informing the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

We do not regard this reference in the same way that we do

---

[28]*See*, *e.g.*, Fouts, 79 IND. L.J. at 342-43 (suggesting that the phrase "candor, honesty, and good faith" should be removed, and the language relating to the independence of the grand jury be moved to the beginning of the instruction).

vouching for witnesses. *See United States v. Combs*, 379 F.3d 564, 574-76 (9th Cir. 2004) (improper vouching by prosecutor for government witness constituted plain error requiring reversal); *United States v. Ortiz*, 362 F.3d 1274, 1278 (9th Cir. 2004). The U.S. attorney is not testifying, but is presenting the testimony of others. The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Nat'l Treasury Employees Union v. Reagan*, 509 F. Supp. 1337, 1342 (D.D.C. 1981) ("[T]he judiciary is legally bound to give deference to the presumption of regularity of the actions taken by a coordinate and equal branch of government (here the executive) unless it is contrary to law.").

Again, the question before us is whether this language is unconstitutional, not whether it is overly deferential or unnecessary. This passage would be problematic if it misinstructed the grand jury that it was an agent of the U.S. attorney and not an independent body acting as a check to the prosecutor's power. However, it does not do this. It reminds the grand jury that it stands between the government and the accused and is independent. The laudatory language is likely unnecessary, but it surely does not threaten the constitutional relationship between the prosecutor and grand jury.

[10] In upholding the model grand jury instructions against Appellants' constitutional challenge, we do not necessarily hold that the current instructions could not or should not be improved. We recognize the commentary pointing to discrete changes that tend to reduce the independence of the modern grand jury[29] and the commentary urging reform in expanding

---

[29]One change is that federal grand juries no longer use their presentment power. While presentments used to be a source for grand juries to express

the grand jury's duty and role in the criminal process.[30] We even concede that there may be more done to further increase the shielding power of the modern federal grand jury. However, we are not a drafting committee for the grand jury instructions.[31] We are not faced with the question of how to reform the modern grand jury but whether its model instructions are

their grievances and views about current events, in 1946, the Federal Rules of Criminal Procedure omitted any reference to the presentment power. Renee B. Lettow, Note, *Reviving Federal Grand Jury Presentments*, 103 YALE L.J. 1333, 1343 (1994) ("For all practical purposes, the Federal Rules of Criminal Procedure have abolished the grand jury's presentment power.").

[30]Despite pleas by commentators for reform, Congress has not attempted to reform the federal grand jury for several years. Mark J. Kadish, *Behind the Locked Door of An American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 FLA. ST. U. L. REV. 1, 63 (1996) (noting that "the last major effort by Congress at federal grand jury reform" was the Grand Jury Reform Act of 1985, H.R. 1407, 99th Cong. (1985)). In the late 1970s, Congress considered reforming the grand jury after alleged abuses of the system by President Nixon's Justice Department. Leipold, 80 CORNELL L. REV. at 272. Congress even considered several proposals to abolish the grand jury requirement from the Fifth Amendment. *Id.* (citing *Grand Jury Reform: Hearings on H.R. 94 Before the Subcomm. on Immigration, Citizenship, and International Law of the House Comm. on the Judiciary*, 95th Cong. 995-1002 (1977) (text of four proposed amendments); *id.* at 1003 (summary of proposals)).

[31]In fact, we note that the Committee on Court Administration and Case Management is currently considering proposed revisions to the Model Grand Jury Charge approved by the Judicial Conference in 1986. Committee Activities, *Report of the Proceedings of the Judicial Conference of the United States* 13 (Sept. 21, 2004). In March 2005, the Committee submitted a proposed model grand jury charge to the Judicial Conference. Committee on Court Administration and Case Management, *Addendum to the Report of the Judicial Conference: Model Grand Jury Charge* app. 1 (March 2005). After a comprehensive review of the two existing model grand jury charges, the one in the *Benchbook for U.S. District Court Judges* and the Model Grand Jury Charge approved by the Judicial Conference in 1986, the Committee recommended a draft model grand jury charge that included all three phrases that Appellants challenge here. *Id.* at App. D-2, D-7, D-8.

constitutional. To answer this question, we hold that the provisions of the model grand jury instructions challenged here are constitutional.

## III.   FACIAL CONSTITUTIONALITY OF 21 U.S.C. §§ 841 and 960

**[11]** Appellants argue that 21 U.S.C. §§ 841 and 960 are unconstitutional on their face because they permit the judge to determine the sentencing factors by a preponderance of the evidence, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[32] We rejected facial challenges to sections 841 and 960 in *United States v. Buckland*, 277 F.3d 1173, *amended*, 289 F.3d 558, 563-68 (9th Cir. 2002) (en banc) (Section 841), and *United States v. Mendoza-Paz*, 286 F.3d 1104, 1110 (9th. Cir. 2002) (Section 960). *See also United States v. Jimenez,* 300 F.3d 1166, 1171 (9th Cir. 2002); *United States v. Carranza*, 289 F.3d 634, 643 (9th Cir. 2002); *United States v. Varela-Rivera*, 279 F.3d 1174, 1175 n.1 (9th Cir. 2002).

**[12]** Appellants now claim that the Supreme Court's decision in *Harris v. United States*, 536 U.S. 545, 552 (2002), has undermined the method of statutory construction employed in *Buckland* and followed in *Mendoza-Paz*. We rejected a similar argument in *United States v. Hernandez*, 322 F.3d 592, 600-02 (9th Cir. 2003). We adopt our reasoning in *Hernandez* and reaffirm that 21 U.S.C. §§ 841 and 960 require material facts to be submitted to the jury and proved beyond a reasonable doubt, consistent with *Apprendi*. So construed, Sections 841 and 960 are not facially unconstitutional.

---

[32]We review this challenge to the constitutionality of a statute *de novo*. *United States v. Serang*, 156 F.3d 910, 913 (9th Cir. 1998).

## IV.   CONCLUSION

For the foregoing reasons, the decision of the district court denying Appellants' motion to dismiss their indictments is AFFIRMED.

**Volume 2 of 2**

HAWKINS, Circuit Judge, with whom Circuit Judges PREGERSON, WARDLAW, W. FLETCHER, and BERZON join, Dissenting:

The majority tells us that a constitutionally created institution, designed precisely to filter prosecutorial desire through citizen judgment, must give way to the unbridled exercise of prosecutorial discretion. The majority arrives at this remarkable conclusion by relying principally upon British history and the use of the grand jury in England prior to King George III. Yet the presence of the grand jury in our constitutional system is a uniquely American institution, born out of concern for unchecked government power and the experience of American colonists that led them to separate themselves from the very history the majority embraces.

### *History of the Grand Jury Requirement*

When Congressman James Madison sat down to write out a series of proposed amendments to the freshly-adopted Constitution, he was painfully aware of the ratification process in which the absence of a Bill of Rights had provoked such strident opposition. Fresh in the minds of the former colonists was their treatment at the hands of the British Crown and their reliance on devices that protected them from what they saw as the arrogant exercise of the Crown's authority. Opponents of the proposed constitution wanted assurances that what they

viewed as the best of those protections would continue in the new government.[1] On any short list of those protective devices would have been the grand jury. When King George III's colonial appointees sought sedition charges against John Peter Zenger for his editorials critical of the Crown, and when participants in the Boston Tea Party faced criminal charges, what stood between Americans and the dock was a grand jury made up of their fellow citizens, free to refuse a prosecutor's entreaties or a king's demands.[2]

The grand jury requirement now lives in the Fifth Amendment. It says, plainly and simply, that no serious (felony) charge may be brought without the approval of a group of citizens, drawn at large from the community, who are entirely free to charge what the government proposes, to charge differently, or to not charge at all. Operating in secret and answerable to no one for its decisions, the grand jury is a truly unique institution.

Two hundred fifteen years have brought about some considerable changes in the grand jury. Its use as an investigative tool is more common now, as is criticism for its potential for

[1]*See* Drew R. McCoy, *The Last of the Fathers: James Madison & the Republican Legacy* 89 (1989) ("He never forgot his daunting experience at the 1788 convention in Richmond; the Federalists' razor-thin margin of victory there had reflected the strength, among many delegates whom Madison greatly respected, of the fear that excessive power would accrue to the general government.").

[2]*See* Leroy D. Clark, *The Grand Jury: The Use and Abuse of Political Power* 18 (1975). For other historical examples, *see generally* Marvin E. Frankel & Gary Naftalis, *The Grand Jury: An Institution on Trial* 9 (1977). To be sure, our historical experience also includes instances where the grand jury has acted to protect insiders against outsiders, and majorities against minorities. The grand jury has also been criticized for serving as a modern-day Star Chamber. *See generally* Michael E. Deutsch, *The Improper Use of the Federal Grand Jury: An Instrument for the Internment of Political Activists*, 75 J. Crim. L. & Criminology 1159, 1179-83 (1984); David J. Fine, Comment, *Federal Grand Jury Investigation of Political Dissidents*, 7 Harv. C.R.-C.L. L. Rev. 432 (1972).

abuse. But regardless of its apparent virtues and vices, the requirement of the grand jury's independent exercise of its discretion is a fixed star in our constitutional universe. For that reason, it is important to consider whether the way in which our courts today instruct grand jurors comports with the constitutional history of the Fifth Amendment and the grand jury institution.

### *The Challenged Instructions & The Remedy*

Critical to an understanding of the serious constitutional issue we face is what the challenged grand jury instructions *do* say and the remedy the appellants *do* seek. As to the first, the grand jurors here were clearly and improperly told that their powers were limited to determining probable cause. They were also told that they could not consider the wisdom of the law or the possible punishment, and that they could expect "candor, honesty, and good faith in matters presented by the government attorneys." As to the second, the appellants do not seek a nullification instruction. Instead, both Leon-Jasso and Navarro-Vargas propose that "the judge not tell the jury that the law requires that the grand jury not consider the wisdom of criminal laws or punishment, since the law is the exact opposite."

## A. Improperly Limiting Grand Jurors to Probable Cause Determination

The instructions begin by telling the grand jurors that what would follow outlines their responsibilities. This prefatory emphasis is significant because the instructions go on to explain that "the purpose of the Grand Jury is to determine whether there is sufficient evidence to justify a formal accusation against a person." A grand juror paying close attention would conclude that the purpose of the grand jury is *singular* and that its discretion is constrained by the instruction.

This impression is confirmed again later in the charge: "Your task is to determine whether the government's evi-

dence as presented to you is sufficient to cause you to conclude that there is probable cause." Once again, the instruction defines the purpose, or "task," singularly, and even the majority concedes that "the terms 'purpose' and 'task' are singular, conveying that the jury has a unique purpose." Once again, the unique purpose conveyed is determining probable cause. The instruction seems to compel the grand jury to indict as long as probable cause exists: "[Y]ou should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged."

The majority discounts the admonishment "should," arguing that it is distinct from "must" or "shall." Even "[a]s a matter of pure semantics," the majority is incorrect to say that the use of the word "should" preserves the grand jury's discretion. The word "should" is used "to express a duty [or] obligation." THE OXFORD AMERICAN DICTION AND LANGUAGE GUIDE 931 (1999); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1085 (10th ed. 1998) ("used in auxiliary function to express obligation, propriety, or expediency"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1670 (3d ed. 1992) ("Used to express obligation or duty"); Dictionary.com, http://dictionary.reference.com/search?q=should ("Used to express obligation or duty") (last checked Apr. 5, 2005). The "should" and "shall" distinction is a lawyer's distinction, not a difference most lay people sitting as grand jurors would be likely to understand. The instruction's use of the word "should" is most likely to be understood as imposing an inflexible "duty or obligation" on grand jurors, and thus to circumscribe the grand jury's constitutional independence.

This "should" admonishment is at odds with the grand jury's broad independent role. As the Supreme Court held in *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986), "[t]he grand jury does not determine *only* that probable cause exists to

believe that a defendant committed a crime, or that it does not." (emphasis added).

The grand jury's defining feature is its independence. The Fifth Amendment deliberately inserts a group of citizens between the government's desire to bring serious criminal charges and its ability to actually do so. "It is a constitutional fixture in its own right[,] . . . belong[ing] to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *United States v. Williams*, 504 U.S. 36, 47 (1992) (internal citations omitted). Indeed, "the Fifth Amendment's 'constitutional guarantee *presupposes* an investigative body acting independently of either [the] prosecuting attorney *or judge*.' " *Id*. at 49 (quoting *United States v. Dionisio*, 410 U.S. 1, 16 (1973)) (emphasis in original; internal quotations omitted). The history of the adoption of the grand jury requirement in the Bill of Rights underscores its independent role,[3] and its independence was noted by courts at the founding of the Republic. *See United States v. Smith*, 27 F. Cas. 1186, 1188 (C.C.D.N.Y. 1806) (No. 16341A) ("Grand juries are the offspring of free government; they are a protection against illfounded accusations.").

## B.    Limiting Grand Jury's Protective Role

The grand jury's independence serves not only in the determination of probable cause, as these grand juries were instructed, but also to protect the accused from the other branches of government by acting as the "conscience of the community." *Gaither v. United States*, 413 F.2d 1061, 1066 n.6 (D.C. Cir. 1969) ("Since it has the power to refuse to indict even where a clear violation of law is shown, the grand jury can reflect the conscience of the community in providing relief where strict application of the law would prove unduly harsh.") (citation, internal quotation omitted).

---

[3]*See* sources cited in notes 1-2.

The significance of this second — and potentially protective — role should not be understated. Indeed, the strength of this understanding is emphasized in *Vasquez*. There, the Supreme Court said:

> In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense — all on the basis of the same facts. Moreover, "[the] grand jury is not bound to indict in every case where a conviction can be obtained." *United States v. Ciambrone*, 601 F.2d 616, 629 (CA2 1979) (Friendly, J., dissenting).

474 U.S. at 263. Judge Friendly's dissent in *Ciambrone* itself cites powerful language on this protective role from another distinguished jurist, Judge John Minor Wisdom:

> By refusing to indict, the grand jury has the unchallengeable power to defend the innocent from government oppression by unjust prosecution. And it has the equally unchallengeable power to shield the guilty, should the whims of the jurors or their conscious or subconscious response to community pressures induce twelve or more jurors to give sanctuary to the guilty.

*United States v. Cox*, 342 F.2d 167, 189-90 (5th Cir. 1965) (Wisdom, J., concurring specially).

Though grand jurors undoubtedly possess these powers, and the majority so acknowledges, majority opinion at 5540, the jurors in this case were misled by the instructions given to them, told that their powers were restricted to probable cause. This necessarily compromises their independence. Further eroding the powers described in *Gaither* and *Vasquez*, the instructions admonish grand jurors:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you. Furthermore, when deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment.

This instruction improperly limits the jurors' discretion regarding the proper scope of application of federal criminal law, as well as matters of sentencing.

### 1.   Questioning the Wisdom of the Law & Prosecutorial Discretion[4]

As to questioning the wisdom of a criminal law, consider the language from the *Gaither* decision: "Since it has the power to refuse to indict even where a clear violation of law is shown, the grand jury can reflect the conscience of the community in providing relief where strict application of the law would prove unduly harsh." *Gaither*, 413 F.2d at 1066 n.6 (citation, internal quotation omitted).[5] How is it then that the grand jury lacks the power to consider the wisdom of a law applied to a particular case?[6]

---

[4]Judge Kozinski was kind enough to refer to and draw upon my earlier dissent in *United States v. Marcucci*, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (Hawkins, J., dissenting), in his dissent from the now-withdrawn panel opinion. *United States v. Navarro-Vargas*, 367 F.3d 896, 899-03 (9th Cir. 2004) (Kozinski, J., dissenting). I return the "favor" here by heavily drawing upon his dissent in this section.

[5]*See also In re Kittle*, 180 F. 946, 947 (S.D.N.Y. 1910) (L. Hand, J.) ("One purpose of the secrecy of the grand jury's doings is to insure against this kind of judicial control. They are the voice of the community accusing its members, and the only protection from such accusation is in the conscience of that tribunal.").

[6]Citizen grand jurors seem to instinctively feel this concern. Consider the following question posed recently to an ethics columnist:

The grand jury must have the power to consider the wisdom of a law because it performs what is undeniably a prosecutorial function. The Fifth Amendment's command that a felony prosecution simply cannot proceed without the approval of the grand jury permits it to act as a check on prosecutorial discretion by the simple act of refusing to return an indictment.[7] The majority is concerned about this unfettered discretion, arguing that "[i]f a grand jury can sit in judgment of wisdom of the policy behind the law, then the power to return a no bill in such cases is the clearest form of 'jury nullification.' " The majority doubts that the grand jury is well-suited to make such judgments on the wisdom of the law, though it appears to accept the concept of prosecutorial discretion in the hands of a United States Attorney: "a decision not to prosecute someone who would likely be indicted and could be convicted is a form of prosecutorial nullification."

Prosecutorial discretion — the decision whether and how to bring charges against a particular defendant — is an important, even critical component of the criminal justice system, whether it be exercised by prosecutors or grand jurors. Not every potential crime can (or should) be investigated or prosecuted, and an important part of the prosecutorial function is deciding which potential defendants to select for criminal prosecution, and how serious the charges should be. Prosecu-

---

> I'm on a grand jury. We've been given cases involving someone who views pornography on his computer behind locked doors and someone caught in the presence of marijuana. The assistant D.A. indicates that I shouldn't abstain from voting, but my conscience won't let me sleep if I make felons out of such people. May I vote not to indict?

Randy Cohen, *Aren't Juries Grand?*, N.Y. Times Magazine, at 28 (Mar. 20, 2005).

[7]*Vasquez*, 474 U.S. at 263. The grand jury can also investigate, *see Williams*, 504 U.S. at 48, and, if it wishes, bring charges not presented to it by a prosecutor, *see Vasquez*, 474 U.S. at 263.

tors can, and often do, make such decisions based on their judgments as to how wise and important certain laws may be.[8]

And herein lies the essential hypocrisy of the government's position. Standing firmly in the defense of its exercise of discretion (amounting at times to nullification), it just as firmly argues that grand jurors are without authority to make similar judgments about which laws deserve vigorous enforcement and which ones do not, in deciding whom to indict, and on what charges. In the government's eye, the grand jury is a mere instrument of prosecutorial will, a probable cause screening device obligated to act at the direction of the prosecutor and then only when the prosecutor has decided whom and how much to charge.

But grand jurors have been traditionally viewed as the "conscience of the community," a function that partakes far more of judgment and discretion than of the narrow ministerial role that the challenged instructions assign to them.[9] Because the *petit* jury may not take into account community values to decide whether to convict, it is even more important to foster this traditional function of the *grand* jury—a body not subject to the prohibition against double jeopardy or other procedural constraints that apply once the case proceeds to trial. *See Williams*, 504 U.S. at 49; *United States v. R. Enters., Inc.*, 498 U.S. 292, 298 (1991).

## 2. Severity of the Punishment

As to the severity of punishment, the Supreme Court in

---

[8]*See* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 599 (2001) ("[P]rosecutors have the discretion not to enforce when the laws are too harsh.").

[9]*See* Ric Simmons, *Re-examining the Grand Jury: Is There Room for Democracy in the Criminal Justice System?*, 82 B.U. L. Rev. 1, 39-44 (2002) (listing cases where grand juries refused to indict despite strong evidence that a criminal law was violated).

*Vasquez* stated that the grand jury has "the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense[,] all on the basis of the same facts." *Vasquez*, 474 U.S. at 263. If grand jurors can choose, per *Vasquez*, between capital and non-capital offenses, how could they not be influencing the determination of punishment? They are exerting such influence, and they should be able to continue to do so, not boxed in by jury instructions that seek to eradicate this important function.

### 3.    Instructions as Structural Protections

After long historical exegesis, the majority apparently agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime. *See* majority opinion at 5540-41 ("[S]ignificantly, the grand jury may refuse to return an indictment even 'where a conviction can be obtained.' ") (quoting *Vasquez*, 474 U.S. at 263).

We part company, however, when it comes to how to protect this power of the grand jury. The majority believes that the "structure" and "function" of the grand jury — particularly the secrecy of its proceedings and unreviewability of many of its decisions — sufficiently protects that power. *See* majority opinion at 5540-43, 5551. But the majority fails to see that the instructions given a grand jury shape its structure and function. Typical grand juries, including the grand jury in these cases, hear evidence from the prosecutor and receive instructions from the judge. Those instructions do not include a reference to *Vazquez* or a discussion of the full range of the grand jury's powers, and include the language we have discussed, which jurors are likely to understand as *precluding* the authority to refuse to indict if there is probable cause. Conscientious grand jurors, instructed as were the jurors in these cases, will *believe* they lack any authority beyond that on which they are instructed, and will act accordingly.

Instructing a grand jury that it lacks power to do anything beyond making a probable cause determination thus unconstitutionally undermines the very structural protections that the majority believes saves the instruction. The power to deliberate in secret is valuable, but limiting the factors included in that deliberation circumscribes that power. Similarly, the power to make unreviewable decisions is a serious power indeed, but limiting the range of considerations that impact those decisions undermines that power. Given the "almost invariable assumption of the law that jurors follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 206 (1987), we must assume that grand jurors followed the instructions offered in this case and, therefore, that the instructions undermined the very structural factors on which the majority rests its decision.

Indeed, there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them. Grand jurors come in with no knowledge of the system, but, one would hope, a desire to fulfill their assigned role, not to flout it. Indeed, our legal system assumes that jurors have this desire, an assumption embodied in the *Richardson* presumption that jurors will fulfill their role as instructed by those in authority.

## C.   Praising the Government Attorneys

Further invading the independence of the grand jury was the court's instruction that it could expect "candor, honesty, and good faith in matters presented by the government attorneys." In Leon-Jasso's case, the judge also told the grand jurors that the prosecutors were "wonderful public servants." What these instructions do not tell grand jurors is that prosecutors are free to deprive the grand jurors of exculpatory evidence, *Williams*, 504 U.S. at 45-47, to provide unconstitutionally seized evidence, *United States v. Calandra*, 414 U.S. 338 (1974), and to present evidence otherwise inadmissible at trial, *Costello v. United States*, 350 U.S. 359

(1956). How independent can a grand jury be when they are told how wonderful the prosecutors are? The majority concedes that the "candor, honesty, and good faith" instruction is "unnecessary language," but attempts to justify its constitutionality by demonstrating that this language has been included for some time and claiming that the laudatory remarks do not threaten the constitutional relationship between the prosecutor and grand jury. Appellants, however, have the better argument: the grand jury's independence is diluted by this instruction, which encourages deference to prosecutors. By undermining the grand jury's independence, this part of the grand jury instruction is also unconstitutional.

### The Petit Jury Analogy

Arguing from a remedy not sought to an institution not involved, the majority relies upon the rejection of nullification instructions in the petit jury context.[10] But this argument ignores an important distinction between the two groups: with petit juries, jeopardy attaches, whereas with grand juries, a new prosecution effort can begin. *See Williams*, 504 U.S. at 49. Because evidence can always be re-presented to a second grand jury, it is far from inevitable that justice will not be done if grand jurors were given a full disclosure instruction.

Because the Framers placed a high value on the kinds of powers articulated by *Vasquez* for grand juries, it would be unjustifiably paternalistic to fail to tell the grand jurors the scope of their constitutional powers over charging decisions specifically entrusted to their judgment. Finally, it is a mistake to conclude that a full disclosure instruction to a grand jury would subvert the rule of law. If our constitutional system permits the grand jury to act on its "conscience," then it hardly makes sense to say that a grand juror who chooses to not indict despite probable cause is acting lawlessly. Rather,

---

[10]*See, e.g., United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1991); *United States v. Simpson*, 460 F.2d 515, 518-20 (9th Cir. 1972).

that action lies fully within the discretion delegated by the Constitution.

The petit jury analogy not only fails, it also provides a powerful reason for allowing the grand jury the independence to consider, for example, the wisdom of the law under which a suspect is to be prosecuted: we no longer permit petit juries to exercise such discretion, *see, e.g., Powell*, 955 F.2d at 1213; *Simpson*, 460 F.2d at 518-20,[11] for the perfectly sensible reason that petit jurors decide guilt or innocence in accordance with clearly established legal standards. If grand juries, too, cannot exercise such discretion, then considerations such as the wisdom of the law will be isolated from any citizen's review, subject only to the prosecutor's discretion.

If the majority's view of the grand jury prevails, then the prosecutor will have discretion over all matters concerning indictment, whereas the *constitutional institution* of the grand jury will not. The prosecutor, a "single employee of the state" not only should not have sole discretion, such sole discretion is not the system envisioned by the Fifth Amendment. *Cf. Apprendi v. New Jersey*, 530 U.S. 466, 498 (2000) (Scalia, J., concurring) ("[I]t is not arguable that, just because one thinks it is a better system [to allow the judge, a single employee of the state, to determine sentencing factors by a preponderance of the evidence], it must be, or is even more likely to be, the system envisioned by a Constitution that guarantees trial by jury.") Adopting a system where discretion is solely in the hands of the prosecutor would result in a "perilous decline" in the grand jury institution, analogous to the decline in the petit jury institution caused by judges determining sentencing factors that increase punishment beyond what is authorized by the jury verdict. *See Ring v. Arizona*, 536 U.S. 584, 611-12 (2002) (Scalia, J., concurring).

---

[11]*See also* Simmons, *supra* note 9 at 47 ("[T]he grand jury has become the primary vehicle for members of the community to participate in and influence the criminal justice system.").

### *Structural Error*

These instructions are unconstitutional because they actively mislead grand jurors into thinking their powers are more constrained than they are. Which raises the next question: if error, is it a structural error, or is it subject to harmless error review?

The answer, based on *Vasquez*, is that it is a structural error. In *Vasquez*, the Supreme Court *presumed* prejudice, concluding that the systematic exclusion of blacks from the grand jury pool amounted to structural error, for which prejudice to the defendant need not be shown. This result issued, despite the argument that "requiring a State to retry a defendant, sometimes years later, imposes on it an unduly harsh penalty for a constitutional defect bearing no relation to the fundamental fairness of the trial." *Vasquez*, 474 U.S. at 262. The *Vasquez* Court rejected this contention, noting that fundamental flaws, such as racial discrimination in the grand jury, "undermine[ ] the structural integrity of the criminal tribunal itself, and [are] not amenable to harmless-error review." *Id*. at 263-64.

To determine whether the presumption of prejudice attaches, the Supreme Court demands that we employ a traditional test: to determine whether "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988). But the high court also stated that courts should look to whether any inquiry into harmless error would require unguided speculation. *Id*.

And, this is indeed an area of "unguided speculation." Perhaps a grand jury would have exercised its discretion in favor of one or all of the defendants here; among other things, Navarro-Vargas is a young man with no serious criminal record, except one previous drug conviction. The judge exercised discretion in favor of Navarro-Vargas by sentencing him

to the "low end of the guidelines." The judge in Leon-Jasso's case noted his military commendation, the impact of a prison term on his family, and his honesty in admitting his conduct, when he granted a two-level downward departure for sentencing, and then sentenced at the bottom of the range. Put differently, it is conceivable that a grand jury made aware of its role as "conscience of the community" would have provided "relief where strict application of the law would prove unduly harsh." *Gaither*, 413 F.2d at 1066 n. 6.

"[A] reviewing court can never know whether or not an unbiased and properly constituted grand jury would have simply declined to indict at all or might have charged a lesser offense." *United States v. Marcucci*, 299 F.3d 1156, 1173 (9th Cir. 2002) (Hawkins, J., dissenting) (citation, internal quotation omitted). Where structural error occurs, it is no adequate reply that the appellants did not demonstrate that "irregularities" existed such that the presumption of regularity should be disturbed. For it is precisely the "regular" and "traditional" functioning of the grand jury—its potential to exercise either justice-guided discretion or compassion-based mercy even against a finding of probable cause—that was hobbled by these instructions. In short, the appellants were denied the "traditional functioning of the institution that the Fifth Amendment demands." *Williams*, 504 U.S. at 51.

Because the defendants here were convicted after their grand juries were erroneously instructed, and because the erroneous instructions constituted a substantial impediment to the regular functioning of the grand jury as envisioned by the Constitution, I would reverse the convictions, dismiss these indictments, and allow the government to re-present evidence to a grand jury properly instructed as to its independent role.[12]

---

[12]Mindful of arguments that this would impose a burden on the government, the Supreme Court's decisions of late remind us that our obligations under the Constitution are not always measured against the metric of efficiency. *See, e.g.*, *Blakely v. Washington*, 124 S. Ct. 2531, 2543 (2004)

UNITED STATES V. NAVARRO-VARGAS

("[O]ur decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice."); *Apprendi*, 530 U.S. at 551 (O'Connor. J., dissenting) (noting that *Apprendi* will "unleash a flood of petitions by convicted defendants seeking to invalidate their sentences"); *Ring*, 536 U.S. at 620-21 (O'Connor. J., dissenting) (expressing similar fears that *Ring* will strain judicial resources).