SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the
Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the
Court.  In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Jerome Shaw, Jr.** (A-59-18) (081652)

**Argued November 18, 2019 -- Decided March 4, 2020**

**RABNER, C.J., writing for the Court.**

In this appeal, the Court considers whether there should be any limits on the
number of times a prosecutor can submit a case to a grand jury to seek an indictment after
a prior grand jury declined to indict.

At about 1:00 a.m. on October 21, 2012, a sergeant with the Upper Saddle River
Police Department came upon a pickup truck blocking a road and facing a house.  The
sergeant noticed a rifle case in the back seat and called for backup.  Soon after, Officer
Edward Riedel and another officer arrived.  Riedel noted that the driver, Jerome Shaw,
Sr. (Shaw Sr.), and his son and passenger, defendant Jerome Shaw, Jr., were dressed in
black clothing and shoes, and each had gloves, a black mask, and black goggles at his
feet.  Both the driver and passenger consented to a search of the rifle case.  Inside it,
Riedel found a large mallet, five crowbars, two sets of pliers, zip ties, a pipe wrench, and
knee pads.  Many of the tools were new and still had price tags attached.  Riedel spoke
separately to Shaw Sr. and defendant.  Each said they were involved in construction work
but relayed a different story.  The police arrested both men.  Defendant had a flashlight in
his pocket along with a list of addresses:  four homes in Upper Saddle River and two in
Mendham.  Defendant and his father resided in New York.

In February 2013, the State presented the case to a grand jury.  Riedel, the sole
witness, recounted much of the above information.  The grand jury declined to authorize
the proposed charges.  The State resubmitted the case to a second grand jury in March.
Once again, Riedel was the only witness, and he presented similar testimony with some
additional facts.  This time, the grand jury voted to indict.  The trial court, however,
dismissed the true bill as a violation of the "multiple presentation rule."

In April 2013, the prosecution presented the case a third time to another grand
jury.  Riedel presented largely the same testimony.  In addition, the prosecution called an
expert in burglary investigations who explained the significance of certain items found at
the scene, including that experienced burglars often purchase new tools before
committing a burglary because paint chips can yield a possible forensic match.  The
grand jury returned a ten-count indictment charging Shaw Sr. and defendant.

1

Defendant argued that the prosecution presented essentially the same evidence before the third grand jury and that the indictment should therefore be dismissed. The trial court found that the State had offered new and different expert testimony and did not violate the "multiple presentation rule."

The Appellate Division affirmed. 455 N.J. Super. 471, 492 (App. Div. 2018). It expressed confidence that the Court "would place some limits on successive resubmissions." Id. at 488. But the appellate court found that resubmission in this case did not deprive defendant "of fundamental fairness." Id. at 476, 490.

The Court granted defendant's petition for certification limited to a single issue: whether defendant's indictment should have been dismissed because the State presented its case to three grand juries. 236 N.J. 632 (2019).

**HELD:** Invoking its supervisory authority, the Court holds that if grand juries decline to indict on two prior occasions, the State must obtain advance approval from the Assignment Judge before it can submit the same case to a third grand jury. To decide whether to permit a third presentation, Assignment Judges should consider whether the State has new or additional evidence to present; the strength of the State's evidence; and whether there has been any prosecutorial misconduct in the prior presentations. Based on the circumstances of this case, which did not violate defendant's right to a fundamentally fair grand jury presentation, the Court affirms the judgment of the Appellate Division and declines to dismiss defendant's indictment.

1. The grand jury's role has evolved over the centuries to serve dual functions: to decide if there is probable cause to believe that a crime has been committed and to protect citizens against unfounded criminal prosecutions. Federal prosecutors seek indictments from the grand jury for serious offenses, consistent with the Fifth Amendment. The Fifth Amendment's Grand Jury Clause, however, does not apply to the states, and a majority of states no longer require grand jury indictments. Only eighteen states and the District of Columbia still require a grand jury indictment for serious offenses. (pp. 10-13)

2. New Jersey has retained the use of the grand jury, which is a judicial, investigative body that serves a judicial function, not a law enforcement agency or an alter ego of the prosecutor's office. State and county prosecutors have the responsibility and authority to present cases to a grand jury and seek an indictment. Grand juries, in turn, investigate allegations and decide whether the State has presented sufficient evidence to establish probable cause that a crime has been committed and that the accused committed it. That said, grand jury presentations are not full-fledged trials at which the State must prove a defendant's guilt beyond a reasonable doubt. (pp. 13-15)

3. Judicial review of the grand jury is generally limited. When a grand jury has acted, an indictment should be disturbed only on the clearest and plainest grounds, and only when

2

the indictment is manifestly deficient or palpably defective. If, on the other hand, a grand jury declines to indict, the State has no right of appeal. The Judiciary's power of review is rooted in the doctrine of fundamental fairness, which is an integral part of due process. The doctrine protects citizens against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily. It is applied sparingly, only when the interests involved are especially compelling. (pp. 15-17)

4. The common law imposed no restrictions on a prosecutor's discretion to resubmit a case to the same or another grand jury. The federal government and most states still follow that approach. More than a dozen states restrict the prosecutor's ability to resubmit cases to grand juries, and most of those states require court approval to resubmit. Existing case law in New Jersey neither bars prosecutors from resubmitting a case to a grand jury nor imposes limits on multiple presentations. (pp. 18-20)

5. The Court discusses the important concerns that have led it to exercise its supervisory authority over the grand jury process, which it has used sparingly and only when necessary to ensure the fairness and integrity of grand jury proceedings. Some concerns weigh in favor of imposing limits to enhance the grand jury's role as a buffer between the State and potential defendants; others weigh against imposing extensive limits. In light of those considerations, the Court holds that if grand juries decline to indict on two occasions, the State must obtain advance approval from the Assignment Judge before prosecutors can submit the same case to a third grand jury. The Court acknowledges and accepts the Attorney General's representation that the office is not aware of a case presented to a third grand jury, after multiple no bills, without additional evidence. To determine whether prosecutors can make a third presentation to a grand jury, Assignment Judges should consider the following factors: (1) whether there is new or additional evidence to present -- which would counter the notion that re-presentation is an arbitrary act; (2) the court's assessment of the strength of the evidence in light of the probable cause standard -- to help guard against an unjust proceeding; and (3) the conduct of the prosecution -- specifically, whether there is evidence of misconduct in the prior presentations. (pp. 20-22)

6. The Court agrees with the Appellate Division that, here, defendant's indictment should not be dismissed. Only one grand jury declined to indict; the above framework therefore does not apply to this case. In any event, the prosecution presented materially new evidence to the third grand jury. In addition, the evidence viewed as a whole was quite strong and plainly established probable cause. Finally, the Court does not find that the prosecution engaged in misconduct in the prior grand jury presentations. (p. 23)

**The judgment of the Appellate Division is AFFIRMED.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.**

3

# SUPREME COURT OF NEW JERSEY
## A-59 September Term 2018
### 081652

State of New Jersey,

Plaintiff-Respondent,

v.

Jerome Shaw, Jr., Jerome Shaw,
Jerone Shaw, Jr., and Rome,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 18, 2019 | March 4, 2020 |

Douglas R. Helman, Assistant Deputy Public
Defender, argued the cause for appellant (Joseph E.
Krakora, Public Defender, attorney; Douglas R.
Helman, of counsel and on the briefs, and Anderson
D. Karkov, Designated Counsel, on the briefs).

Nicole Paton, Assistant Prosecutor, argued the cause
for respondent (Mark Musella, Bergen County
Prosecutor, attorney; Nicole Paton, of counsel and on
the briefs and William P. Miller, Special Deputy
Attorney General/Acting Assistant Prosecutor, on the
briefs).

CJ Griffin argued the cause for amicus curiae
American Civil Liberties Union of New Jersey
(American Civil Liberties Union of New Jersey

1

Foundation and Pashman Stein, Walder, Hayden, attorneys; Jeanne LoCicero and Alexander Shalom, of counsel and on the brief, and CJ Griffin, on the brief).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this appeal, we consider whether there should be any limits on the number of times a prosecutor can submit a case to a grand jury to seek an indictment after a prior grand jury declined to indict.

Grand juries decide whether there is sufficient probable cause to return an indictment. At the same time, they serve as a check on the power of the State to bring criminal charges. Although the grand jury is an arm of the court, it is an independent body, so courts are reluctant to intercede directly in the indictment process. This Court has acted only when necessary to ensure the fairness and integrity of grand jury proceedings.

Repeated grand jury presentations about the same conduct present one of those rare circumstances, because the practice increases the risk that an innocent person may be charged with a crime. We therefore invoke the Court's supervisory authority and hold as follows: if grand juries decline to

2

indict on two prior occasions, the State must obtain advance approval from the Assignment Judge before it can submit the same case to a third grand jury. To decide whether to permit a third presentation, Assignment Judges should consider whether the State has new or additional evidence to present; the strength of the State's evidence; and whether there has been any prosecutorial misconduct in the prior presentations.

Based on the circumstances of this case, which did not violate defendant's right to a fundamentally fair grand jury presentation, we affirm the judgment of the Appellate Division and decline to dismiss defendant's indictment.

I.

A.

At about 1:00 a.m. on October 21, 2012, a sergeant with the Upper Saddle River Police Department, who was on routine patrol, came upon a Ford pickup truck blocking West Saddle River Road. He braked hard to avoid hitting the truck and then told the driver to park in the driveway of the home the truck was facing. Two men were in the truck: the driver, Jerome Shaw, Sr. (Shaw Sr.); and his son and passenger, defendant Jerome Shaw, Jr.

The sergeant noticed a rifle case in the back seat and called for backup. Soon after, Officer Edward Riedel and another officer arrived. Riedel noted

3

that both men were dressed from head to toe in black clothing and shoes. Each also had a pair of gloves, a black mask, and black goggles at his feet.

Both the driver and passenger consented to a search of the rifle case. Inside it, Riedel found a large mallet, five crowbars, two sets of pliers including one for cutting, different types of zip ties, a pipe wrench, and knee pads. Many of the tools were new and still had price tags attached.

Riedel spoke separately to Shaw Sr. and defendant. Each said they were involved in construction work but relayed a different story. Defendant claimed he and his father were working on a residence in New Jersey, but when pressed for details he was unable to identify the address, town, or type of construction work. Shaw Sr. said he was doing commercial construction work at a strip mall somewhere in the area of Route 17.

The police arrested both men. Riedel found a flashlight and a rock about the size of a tennis ball in Shaw Sr.'s pocket. Defendant also had a flashlight in his pocket along with a handwritten list of addresses on a piece of paper: four homes in Upper Saddle River and two in Mendham. Defendant and his father resided in New York.

B.

On February 28, 2013, the State presented the case to a grand jury. Riedel, the sole witness, recounted much of the above information. The grand

4

jury declined to authorize the proposed charges -- conspiracy to commit burglary, multiple counts of attempted burglary, and multiple counts of possession of a weapon for an unlawful purpose -- and returned a no bill.[1]

The State resubmitted the case to a second grand jury on March 20, 2013. Once again, Riedel was the only witness, and he presented similar testimony with some additional facts. This time, the grand jury voted to indict. The trial court, however, dismissed the true bill on its own motion. The judge later explained that prosecutors cannot "go to the grand jury more than once on the same facts" without violating what she called "the multiple presentation rule."

On April 16, 2013, the prosecution presented the case a third time to another grand jury. Riedel presented largely the same testimony. In addition, the prosecution called Captain Timothy Condon as a witness. Condon testified as an expert in burglary investigations and explained the significance of certain items found at the scene. For example, he explained that paint chips can remain on a crowbar used in a break-in. Condon noted that experienced burglars therefore often purchase new tools before committing a burglary and then discard them to avoid a possible forensic match afterward; construction

---

[1] When a grand jury authorizes an indictment, it returns a "true bill." When it declines to indict, it returns a "no bill." Wayne R. LaFave et al., 3 <u>Criminal Procedure</u> § 8.2(a) (4th ed. updated 2019).

tools, by contrast, are often well-worn from regular use. Condon also testified that zip ties can be used to restrain people in a home during a break-in.

The grand jury returned a ten-count indictment charging Shaw Sr. and defendant with one count of third-degree conspiracy to commit burglary, N.J.S.A. 2C:5-2 and 2C:18-2; six counts of third-degree attempted burglary -- one for each home listed on the handwritten note -- N.J.S.A. 2C:5-1 and 2C:18-2(a)(1); and three counts of third-degree possession of a weapon for an unlawful purpose -- a sledgehammer, mallet, and prybar, respectively -- N.J.S.A. 2C:39-4(d).

## C.

Defendant argued that the prosecution presented essentially the same evidence before the third grand jury and that the indictment should therefore be dismissed. The trial court found that Captain Condon offered new and different expert testimony and did not violate "the multiple presentation rule." The judge accordingly denied the motion to dismiss.

Defendant later pled guilty to conspiracy to commit burglary and a disorderly persons offense for possession of burglary tools.[2] The court sentenced defendant to five years in prison, with two years to be served

---

[2] Shaw Sr. pled guilty to the same charges and is not involved in this appeal.

6

without parole, to run concurrently with a North Carolina sentence defendant was already serving.[3]

The Appellate Division affirmed defendant's conviction. State v. Shaw, 455 N.J. Super. 471, 492 (App. Div. 2018). In its thoughtful opinion, the Appellate Division observed that "no New Jersey statute or common law precedent . . . categorically bars a prosecutor from choosing to resubmit a case to a new grand jury after one has previously voted a no bill, or requires the State to present new evidence as a condition of resubmission." Id. at 484. The court also surveyed practices in other jurisdictions. Id. at 485-87.

The Appellate Division considered reasons for and against imposing limits on a prosecutor's ability to resubmit a case. Id. at 487-88. Ultimately, the Appellate Division deferred to this Court: "[W]e are confident our Court would place some limits on successive resubmissions, in order to respect the grand jury's screening function to shield the innocent; control the abusive exercise of prosecutorial discretion; and assure defendants fundamental fairness." Id. at 488.

---

[3] At the time of the plea, the trial court said it intended to impose a twenty-month, rather than a twenty-four month, parole bar as part of the sentence. In addition, the judgment of conviction makes no mention of any period of parole ineligibility. We do not disturb the Appellate Division's decision to remand for reconsideration of the minimum period of parole ineligibility.

In this case, the Appellate Division noted that two out of three grand juries returned an indictment and "the State presented new and material evidence to" the third grand jury. Id. at 489. The court found no abuse of prosecutorial discretion and concluded defendant did not show that resubmission "deprived him of fundamental fairness." Id. at 476, 490.

We granted defendant's petition for certification limited to a single issue: whether defendant's indictment should have been dismissed because the State presented its case to three grand juries. 236 N.J. 632 (2019). We also granted leave to the Attorney General and the American Civil Liberties Union of New Jersey (ACLU) to participate as friends of the Court.

## II.

Defendant argues that his motion to dismiss the indictment should have been granted. He contends that, after the first grand jury failed to return a true bill, later indictments for the same offenses, without new evidence, violated his right to fundamental fairness. Defendant urges this Court to use its supervisory powers to limit the number of times a prosecutor may resubmit a case to a grand jury. He submits that judges should look to the factors set forth in State v. Abbati, 99 N.J. 418, 435 (1985), which we discuss later, to decide whether the State may re-present a case after a no bill. Applying those

8

factors, defendant contends that the third grand jury presentation was fundamentally unfair.

The ACLU likewise argues that there should be a limit on the number of times a matter may be resubmitted to a grand jury. To preserve the grand jury's role to safeguard citizens against unfounded prosecutions and also allow prosecutors "a second chance to obtain an indictment in difficult cases," the ACLU proposes the following standard: if two grand juries return a no bill, prosecutors should not be permitted to resubmit the matter to a third grand jury unless there is new evidence that was previously unavailable to the prosecutor and the Assignment Judge approves the third presentation.

The State asserts that resubmitting this matter to multiple grand juries did not violate defendant's right to fundamental fairness. The State maintains there was overwhelming evidence of probable cause, despite the initial no bill, and no abuse of discretion in re-presenting the case. In addition, the State contends there is no need for the Court to set a standard for resubmissions. In any event, the State notes that the factors outlined in <u>Abbati</u> should not apply prior to trial and would not warrant relief here regardless.

The Attorney General agrees that the State properly exercised its discretion to present this case to a third grand jury after the trial judge erroneously dismissed the second grand jury's indictment. Like the State, the

Attorney General contends there is no need for additional oversight of the grand jury process. In the alternative, the Attorney General proposes a non-exclusive list of ten factors for courts to consider if the prosecution presents a matter to more than two grand juries without any new evidence.

III.

A.

The grand jury's role has evolved over the centuries to serve "dual function[s]": to decide "if there is probable cause to believe that a crime has been committed and [to protect] citizens against unfounded criminal prosecutions." United States v. Sells Eng'g, Inc., 463 U.S. 418, 423 (1983) (quoting Branzburg v. Hayes, 408 U.S. 665, 686-87 (1972)). In that way, the grand jury today operates as both a sword and shield. See United States v. Navarro-Vargas, 408 F.3d 1184, 1190-91 (9th Cir. 2005) (en banc).

The origin of the modern grand jury can be traced to the twelfth century in England. Sara Sun Beale et al., Grand Jury Law & Practice § 1:1 at 1-2 (2d ed.). Twelve out of every 104 men in a township or village would be called on to answer whether any local person had been "accused of or reputed to have committed certain crimes." Beale, § 1:2 at 1-5 to -6 (quoting Roger D. Groot, The Presentment Jury Before 1215, 26 Am. J. Legal Hist. 3 (1982)). Early grand juries heard no evidence and did not decide whether an accusation was

10

true or false.  Id. at 1-6.  They instead reported on crimes and suspicions they either knew or had heard about, id. at 1-4, and "[a]nyone accused was required to undergo trial by ordeal," id. at 1-5.  The earliest grand juries, then, operated "not . . . as a shield to protect the accused, but as a sword to be wielded on behalf of the Crown."  Navarro-Vargas, 408 F.3d at 1190.

By the late fourteenth century, the "accusing" jury had grown into a "grande inquest," in which the sheriff summoned twenty-four people of substantial rank to hear accusations by third parties as well as testimony.  Beale, § 1:2 at 1-8 to -9.  If the grand jury believed the charges, it could endorse an accusation as a true bill.  Ibid.

In 1642, Lord Coke interpreted language in the Magna Carta to guarantee the right to a grand jury indictment.  Id. at 1-9.  And decades later, the independence of grand juries began to take hold in English law.  See ibid.  In 1681, for example, despite considerable political pressure, grand juries blocked King Charles II from trying the First Earl of Shaftesbury and one of his followers, Stephen Colledge, for treason.  Id. at 1-9 to -10; Andrew D. Leipold, Why Grand Juries Do Not (and Cannot) Protect the Accused, 80 Cornell L. Rev. 260, 281-82 (1995).  The King, though, ultimately obtained an indictment of Colledge from a sympathetic grand jury, and the Earl, fearing the same fate, fled the country.  Leipold, 80 Cornell L. Rev. at 282.

11

All of the English colonies in North America adopted the grand jury system to institute criminal charges. Beale, § 1:3 at 1-11. After the Revolution, the federal government and each new state did likewise. See U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."); Beale, § 1:4 at 1-15 to -16.

As in England, grand juries took on "an important and historic" role in curbing the power of the government. See State v. Fortin, 178 N.J. 540, 638 (2004). In colonial times, grand juries frustrated the enforcement of unpopular British laws. Beale, § 1:3 at 1-14 to -15. When royal prosecutors sought to prosecute by information instead, colonists enacted the right to indictment in local law. Id. at 1-15. Years later, in the Civil War era, grand juries in the North were slow to indict people for charges related to the abolition of slavery. Navarro-Vargas, 408 F.3d at 1194; Leipold, 80 Cornell L. Rev. at 286.

Today, federal prosecutors seek indictments from the grand jury for serious offenses, consistent with the Fifth Amendment. The Fifth Amendment's Grand Jury Clause, however, does not apply to the states. Branzburg, 408 U.S. at 688 n.25 ("[I]ndictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment . . . .").

A majority of states no longer require grand jury indictments and allow crimes to be prosecuted by information. Wayne R. LaFave et al., 4 <u>Criminal Procedure</u> § 15.1(g) (4th ed. updated 2019). Typically in such cases, there is a judicial finding about whether the charges are supported by probable cause. <u>Fortin</u>, 178 N.J. at 638. Only eighteen states and the District of Columbia still require a grand jury indictment for serious offenses. LaFave, 4 <u>Criminal Procedure</u> § 15.1(d).

B.

New Jersey has retained the use of the grand jury. The grand jury process at common law "was made a part of the law of this State by virtue of . . . the Constitution of 1776." <u>Bd. of Health of Weehawken Twp. v. N.Y. Cent. R.R. Co.</u>, 10 N.J. 294, 303 (1952). The Constitution of 1844 expressly guaranteed the right to "presentment or indictment of a grand jury" at Article I, Paragraph 9. <u>Id.</u> at 304. In much the same language, the modern Constitution of 1947 continued the right to indictment by grand jury:

> No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases now prosecuted without indictment, or arising in the army or navy or in the militia, when in actual service in time of war or public danger.
>
> [<u>N.J. Const.</u> art. I, ¶ 8.]

13

Today, grand juries operate in all twenty-one counties and at the state level. They continue to serve a dual purpose: to determine if probable cause exists and to "stand[] between the defendant and the power of the State" and protect "defendant[s] from unfounded prosecutions." Fortin, 178 N.J. at 638; see also State v. Murphy, 110 N.J. 20, 29 (1988) (noting that grand juries both "bring[] the guilty to trial" and "protect[] the innocent" (quoting Case Note, 111 U. Pa. L. Rev. 1000, 1003 (1963))). Grand juries, whose members are drawn from a cross-section of the community, also "represent[] a democratic safeguard to our judicial system." Fortin, 178 N.J. at 638.

In New Jersey, the grand jury "is an arm of the court." In re Grand Jury Appearance Request by Loigman, 183 N.J. 133, 141 (2005). It "is a judicial, investigative body" that serves "a judicial function," "not a law enforcement agency or an alter ego of the prosecutor's office." Ibid.

State and county prosecutors have the responsibility and authority to present cases to a grand jury and seek an indictment. N.J.S.A. 2B:22-6 (empowering the Attorney General and designees); N.J.S.A. 2A:158-5 (vesting county prosecutors with the same power). Grand juries, in turn, investigate allegations and decide whether the State has presented sufficient evidence to establish probable cause that a crime has been committed and that the accused committed it. State v. Hogan, 144 N.J. 216, 227 (1996).

14

That said, grand jury presentations are not full-fledged trials at which the State must prove a defendant's guilt beyond a reasonable doubt. Prosecutors typically make abbreviated presentations to the grand jury that are designed to satisfy the lower standard of probable cause. See Beale, § 8:6 at 8-56 to -57. Prosecutors may also present hearsay testimony before the grand jury. State v. McCrary, 97 N.J. 132, 146 (1984).

C.

Judicial involvement with and review of the grand jury is generally limited. Under federal law, the grand jury's "relationship with the Judicial Branch has traditionally been . . . at arm's length." United States v. Williams, 504 U.S. 36, 47 (1992). Courts do not preside over or control its day-to-day functioning. See ibid. The United States Supreme Court has also declined to extend the exclusionary rule to grand jury proceedings, United States v. Calandra, 414 U.S. 338, 349-52 (1974), or require prosecutors to present exculpatory evidence, Williams, 504 U.S. at 55.

Although this Court has supervisory authority over the grand jury to remedy unjust practices, Hogan, 144 N.J. at 231, we have "recognized the grand jury's independence" and have been "reluctan[t] to intervene in the indictment process," id. at 228. When a grand jury has acted, "[a]n indictment should be disturbed only on the 'clearest and plainest ground[s],'" State v.

15

Perry, 124 N.J. 128, 168 (1991) (quoting State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 18-19 (1984)), and "only when the indictment is manifestly deficient or palpably defective," Hogan, 144 N.J. at 229. If, on the other hand, a grand jury declines to indict, the State has no right of appeal. See Beale, § 8:6 at 8-57. Even an "erroneous refusal" to indict cannot be reviewed by the courts. See ibid.

The Judiciary's power of review is rooted in the doctrine of fundamental fairness, which is "an integral part of due process." State v. Saavedra, 222 N.J. 39, 67 (2015) (quoting State v. Miller, 216 N.J. 40, 71 (2013)). The doctrine "protect[s] citizens . . . against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily." Doe v. Poritz, 142 N.J. 1, 108 (1995) (emphasis omitted). It is applied "sparingly," only when "the interests involved are especially compelling." Ibid.

The doctrine has been invoked to ensure that grand jurors have been present or informed of the evidence at each session in order to vote to indict, State v. Del Fino, 100 N.J. 154, 164-65 (1985), and to require prosecutors to bring to the court's attention "evidence of partiality or bias" held by grand jurors, Murphy, 110 N.J. at 33. Unlike federal law, the Court has also invoked its supervisory authority to impose "a limited duty on prosecutors" to present

evidence to the grand jury "that both directly negates the guilt of the accused and is clearly exculpatory." Hogan, 144 N.J. at 237.

Principles of fundamental fairness also underlie a court's inherent authority to dismiss an indictment with prejudice after one or more hung juries. Abbati, 99 N.J. at 427. To guide trial judges as they make that decision, the Court outlined five factors to consider:

> (1) the number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney.
>
> [Id. at 435.]

Judges must also consider the prosecutor's reasons to retry the case and the impact of another trial upon the defendant. Ibid.

Prosecutorial vindictiveness in the indictment process may also run afoul of due process and warrant court intervention. See Blackledge v. Perry, 417 U.S. 21, 28 (1974); State v. Gomez, 341 N.J. Super. 560, 571-72 (App. Div. 2001).

17

IV.

With those concerns in mind, we consider the limits on a prosecutor's authority to resubmit cases to a grand jury.

A.

The common law imposed no restrictions on a prosecutor's discretion to resubmit a case to the same or another grand jury. See United States v. Thompson, 251 U.S. 407, 413-16 (1920); Commonwealth v. McCravy, 723 N.E.2d 517, 521 (Mass. 2000) ("[A]t common law, a prosecutor retained the discretion to resubmit a charge to a grand jury after having been dismissed by a previous grand jury.").

The federal government and most states still follow that approach. See Thompson, 251 U.S. at 414-15 (declining to require court approval before a prosecutor can resubmit charges to a grand jury); LaFave, 4 Criminal Procedure § 15.2(h) ("The longstanding federal rule is that resubmissions are permissible, without court approval, even when the prosecutor presents no additional evidence to the second grand jury."); Beale, § 8:6 at 8-56 ("[M]ost jurisdictions recognize that the prosecutor may resubmit charges to either the same grand jury or to a successor.").

More than a dozen states restrict the prosecutor's ability to resubmit cases to grand juries. See Beale, § 8:6 at 8-60 n.10 (citing Alaska Stat.

18

§ 12.40.080; Ark. Code Ann. § 16-85-513(c); Colo. Rev. Stat. § 16-5-204(4)(e); Ga. Code Ann. § 17-7-53; Idaho Code § 19-1403; Ind. Code § 35-34-2-12(d); Iowa R. Crim. P. 2.3(4)(i); Minn. R. Crim. P. 18.06; Neb. Rev. Stat. § 29-1416(2); Nev. Rev. Stat. § 172.255(4); N.M. Stat. Ann. § 31-6-11.1; N.Y. Crim. Proc. Law § 190.75(3); Okla. Stat. tit. 22, § 383; Or. Rev. Stat. § 132.430(2); S.D. Codified Laws § 23A-5-18).

Most of those states require court approval to resubmit. Id. at 8-62. Some allow resubmission only when the prosecution can present additional evidence. Id. at 8-62 to -63. Georgia imposes limits only after two no bills. Ga. Code Ann. § 17-7-53. New York bars resubmissions after a second no bill. N.Y. Crim. Proc. Law § 190.75(3). The Supreme Judicial Court of Massachusetts declined to limit the government's authority to resubmit to a second grand jury but noted that it "would bear consideration" "[w]hether submission of the same evidence to multiple grand juries would be inconsistent with" the grand jury's purpose. McCravy, 723 N.E.2d at 522.

Outside of the grand jury context, other states have addressed due process concerns when prosecutors repeatedly seek to file similar charges against the same defendant. See, e.g., Commonwealth v. Thorpe, 701 A.2d 488, 490-91 (Pa. 1997) (noting due process considerations when the Commonwealth arrested a defendant a fourth time after failing to present a

19

prima facia case on three occasions); State v. Brickey, 714 P.2d 644, 645, 647 (Utah 1986) (noting that the due process clause of the state constitution and fundamental fairness bar prosecutors from "refiling . . . criminal charges absent a showing of new or additional evidence or other good cause").

Existing case law in our state neither bars prosecutors from resubmitting a case to a grand jury nor imposes limits on multiple presentations. Shaw, 455 N.J. Super. at 484; see also Rosetty v. Twp. Comm. of Hamilton Twp., 82 N.J. Super. 340, 349 (Law Div. 1964) (commenting in dicta, in a civil case, that a grand jury could review and reconsider charges after a no bill within the statute of limitations), aff'd o.b., 96 N.J. Super. 66 (App. Div. 1967).

B.

We begin from a different starting point than most other jurisdictions. Not only is the grand jury an arm of the court in New Jersey, but the Judiciary also exercises supervisory authority over grand juries under the doctrine of fundamental fairness. Our sparing use of that authority in the grand jury context reflects important concerns.

Limits on re-presentations should enhance the grand jury's historic and independent role as a buffer between the State and potential defendants. See Fortin, 178 N.J. at 638. That accords with the grand jury serving as a "democratic safeguard to our judicial system." Ibid.

20

When a grand jury declines to indict, repeated and nearly identical presentations to another grand jury can undermine the grand jury's screening function -- to shield the innocent from prosecution. The practice can also be seen as forum shopping for a desired outcome, which can increase the risk that an innocent person will be charged. See Shaw, 455 N.J. Super. at 487-88. In certain circumstances, such an approach can amount to an abuse of discretion and raise due process concerns. It can also deprive a defendant of a fundamentally fair grand jury proceeding.

Other considerations weigh against imposing extensive limits. As noted earlier, grand jury presentations are distinct from trials. To establish probable cause, prosecutors understandably make abbreviated presentations. Beale, § 8:6 at 8-57. Beyond that, if a grand jury improperly decides not to indict in the face of ample evidence, that decision cannot be appealed, but it can be rectified through a revised presentation. Ibid. Grand juries also have the power to continue to investigate even after they return a no bill. Thompson, 251 U.S. at 413-14.

We recognize that due process concerns are more likely to surface only in limited situations, such as a third or fourth presentation of similar facts in search of essentially the same indictment. In light of all of the above considerations, we hold that if grand juries decline to indict on two occasions,

21

the State must obtain advance approval from the Assignment Judge before prosecutors can submit the same case to a third grand jury.

We rely on our supervisory authority over the administration of criminal procedures, under Article VI, Section 2, Paragraph 3 of the State Constitution, to require that practice. See State v. Henderson, 208 N.J. 208, 278 (2011); Hogan, 144 N.J. at 231; Murphy, 110 N.J. at 36. We acknowledge and accept the Attorney General's representation that the office is not aware of a case presented to a third grand jury, after multiple no bills, without additional evidence.

To determine whether prosecutors can make a third presentation to a grand jury, Assignment Judges should consider the following factors: (1) whether there is new or additional evidence to present -- which would counter the notion that re-presentation is an arbitrary act; (2) the court's assessment of the strength of the evidence in light of the probable cause standard -- to help guard against an unjust proceeding; and (3) the conduct of the prosecution -- specifically, whether there is evidence of misconduct in the prior presentations. Those core issues directly address concerns about fundamental fairness in this context and appear to be a better fit than the factors set forth in Abbati. See Doe, 142 N.J. at 108-09; Abbati, 99 N.J. at 435.

We agree with the Appellate Division that defendant's indictment should not be dismissed.  Only one grand jury declined to indict; the second grand jury returned an indictment that the trial court dismissed on unfounded legal grounds.  The above framework therefore does not apply to this case.

In any event, the prosecution presented materially new evidence to the third grand jury.  An expert in burglary investigations testified about the significance of the items defendant and his father possessed; among other things, the expert explained how certain items were consistent with a burglary scheme.  In addition, the evidence viewed as a whole was quite strong and plainly established probable cause.  Finally, we do not find that the prosecution engaged in misconduct in the prior grand jury presentations.  See Shaw, 455 N.J. Super. at 491.

VI.

For the reasons outlined above, we affirm the judgment of the Appellate Division.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.